UNITED STATES of America,
Appellant,

v.

John W. HINCKLEY, Jr.

UNITED STATES of America,
Appellant,

v.

John W. HINCKLEY, Jr.

Nos. 81-2350, 81-2383.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 3, 1982.
Decided Feb. 23, 1982.

Michael W. Farrell, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time briefs were filed, John A. Terry, Roger M. Adelman and Marc B. Tucker, Asst. U. S. Attys., Washington, D. C., were on brief for appellant.

Gregory B. Craig, Washington, D. C., with whom Vincent J. Fuller, Judith A. Miller and Lon S. Babby, Washington, D. C., were on brief for appellee.

Before ROBINSON, Chief Judge, and WRIGHT and WALD, Circuit Judges.

Opinion PER CURIAM.

PER CURIAM:

On March 30, 1981, the President of the United States, his Press Secretary, a Secret Service agent, and a Metropolitan Police Department officer were shot in an assassination attempt in front of the Hilton Hotel in Washington, D.C. A suspect, John W. Hinckley, Jr., was apprehended on the scene and taken into custody. Hinckley has been charged with three federal[1] and five District of Columbia offenses.[2] In a pretrial ruling,[3] the district court suppressed certain evidence that it found had been obtained in violation of the constitutional protections against compelled self-incrimination[4] and unreasonable searches and seizures.[5] The government brought this expedited appeal, and argues that the district court erred in its factual findings and legal conclusions, and in the alternative, that even if the evidence was obtained in an unconstitutional manner, it should be usable at trial under certain novel theories[6] advanced by the government attorneys.

The appeal concerns two separate incidents,[7] one of which occurred the day of Hinckley's arrest and the other some months later while he was a pretrial detainee undergoing mental evaluation at the Federal Correctional Institution in Butner, North Carolina (Butner). On the day of his arrest, Hinckley was held in custody first by the Metropolitan Police Department of the District of Columbia (MPD) and later by the Federal Bureau of Investigation. No misconduct by the local police has been alleged.[8] When the FBI assumed jurisdiction over the case and took custody of

1. These are (1) attempted assassination of the President of the United States, 18 U.S.C. § 1751(c) (1976); (2) assault on a federal officer (in this case, a United States Secret Service agent), id. § 111; and (3) use of a firearm in the commission of a federal offense, id. § 924(c).

2. These are (1) attempt to kill the President, 22 D.C.Code Ann. §§ 501, 3202 (1981); (2) assault with intent to kill, id. §§ 502, 505(b), 3204; (3) assault with a dangerous weapon, id.; (4) assault on a public officer, id.; and (5) carrying a pistol without a license, id. § 3204.

3. United States v. Hinckley, 525 F.Supp. 1342 (D.D.C.1981) (Order), Joint Appendix (J.App.) 35.

4. U.S.Const. amend. V.

5. U.S.Const. amend. IV.

6. See notes 114–19 and accompanying text infra.

7. Other issues decided by the district court are not before us on this appeal.

8. See United States v. Hinckley, 529 F.Supp. 520, 521–22 (D.D.C.1982), (Amended Statement of Reasons) J.App. 39.

Hinckley, however, two federal agents—after advising Hinckley of his right to counsel and his right to remain silent, and despite the fact that Hinckley had asked to confer with an attorney before answering questions—nevertheless questioned him for approximately one-half hour before he had an opportunity to consult with his attorney.[9] Hinckley's request, under clearly established law, precluded any interrogation until he had the opportunity to confer with counsel.[10] The violation of this right—recognized by the Supreme Court fifteen years ago in *Miranda v. Arizona*[11] and recently reaffirmed by the entire Court in *Edwards v. Arizona*[12]—caused the district court to suppress all evidence obtained during this interview.[13] The district court's suppression order extended not only to the information obtained during the questioning, but also to testimony by the agents regarding Hinckley's demeanor during the session.[14]

The second incident involved in this appeal concerns the reading of Hinckley's personal papers by prison guards during a routine search of his cell for contraband. Several sheets of almost illegible handwritten notes bearing on alleged criminal activity were seized by prison authorities during a search for contraband, and subsequently turned over to federal officials investigat-

ing the case.[15] The government attempted to justify the reading of Hinckley's papers as necessary in light of legitimate concerns for his safety and the needs of prison security.[16] The district court determined, however, that the guards had never been instructed by any official at Butner to read Hinckley's papers,[17] and that this fact, in combination with the overall circumstances of Hinckley's confinement, made the action of the guards constitutionally impermissible.[18]

The district court also rejected the government's argument that the reading of Hinckley's notes was justified by the "plain view" doctrine.[19] The government asserted that, in the course of an entirely proper search for contraband, a guard's eyes were caught by the words "prison," "life sentence," and "cooperation with the Justice Department"[20] on the folded sheaf of papers; that those words, happened upon in plain view, properly triggered the guard's concern that Hinckley might be contemplating suicide; that this concern justified reading further; and that the further reading revealed evidence of possible additional criminal conduct. Given this chain of events, the government argues that the entire contents of the document should be

---

**9.** *United States v. Hinckley*, 525 F.Supp. 1342, 1352–1354 (D.D.C.1981) (Memorandum Opinion), J.App. 15–18.

**10.** *Miranda v. Arizona*, 384 U.S. 436, 474–75, 86 S.Ct. 1602, 1627–28, 16 L.Ed.2d 694 (1966); *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981).

**11.** *Supra* note 10.

**12.** *Supra* note 10.

**13.** Memorandum Opinion, *supra* note 9, at 1356–58, J.App. 21–24.

**14.** Amended Statement of Reasons, *supra* note 8, at 521–22, J.App. 39. We note that the prosecution has a number of other sources of demeanor testimony—for example, testimony by MPD officers regarding Hinckley's demeanor during the booking process at police headquarters. We also note that, should Hinckley testify at trial about his statements or demeanor during the interim period, in a manner contradicted by the agents' observations, their oth-

erwise suppressed testimony could be admitted for the limited purpose of impeachment. *See* notes 118–19 and accompanying text *infra*.

**15.** Memorandum Opinion, *supra* note 9, at 1359, J.App. 28.

**16.** *Id.* at 1361, J.App. 31.

**17.** *Id.* at 1361–62, J.App. 32–33.

**18.** *Id.* at 1360–63, J.App. 29–34.

**19.** *See generally Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *In re: Search Warrant Dated July 4, 1977, for Premises at 2125 S Street Northwest, Washington, D.C.*, 667 F.2d 117 at 121–122 (D.C.Cir.1981) (separate opinion of Wald, J.); S. Saltzburg, American Criminal Procedure 208–09 (1980).

**20.** Deposition of Donald Meece at 11 (Oct. 20, 1981).

admissible under the plain view doctrine.[21] The district court did not accept this "almost-plain-view" doctrine; indeed, it found the chain of events broken at the first link because—in the district court's view—far from arousing fears of suicide, the words noticed should, if anything, have alerted the guard that the papers related to Hinckley's case and thus should not be read.[22]

█ On appeal, the district court's conclusions of law are not binding on this court; we are free to draw our own legal conclusions, and it is indeed "the duty of the appellate court to decide whether the correct rule of law has been applied to the facts found."[23] As to factual matters, however, we must abide by the district court's findings unless they are clearly erroneous.[24]

With this background, we turn to the government's arguments on appeal, which are in large part the same as those made before the district court. For the reasons set forth in our analysis below, we do not find them sufficiently persuasive to overturn the district court's suppression order.[25]

## I.  THE *Miranda* ISSUE

We examine first the admissibility of statements made by Hinckley [26] during the 25-minute "background" interview conducted by federal agents after he had asserted his right to speak with an attorney. The government argues primarily that this questioning did not constitute impermissible "interrogation."

### A.  *Factual Background*

#### 1.  *Metropolitan Police Custody*

Immediately following the attempted assassination of the President, Hinckley was arrested and taken to MPD Headquarters in the custody of Secret Service agents and D.C. police. The group arrived at headquarters at 2:40 p. m.[27] At MPD Headquarters Hinckley was read the *Miranda* warnings, first by Secret Service Agent Dennis McCarthy and later by Detective Arthur Myers of the D.C. police force. Hinckley was then taken to the Homicide Squad Office where Detective Myers again advised him of his *Miranda* rights from an official police advice-of-rights form (PD–47).[28]

The reverse side of the PD–47 form contained four waiver questions to which Hinckley could give written responses. Hinckley wrote "yes" in response to (1)

---

**21.** This theory, sketched in the district court's Memorandum Opinion, *supra* note 9, at 1362–63, J.App. 33–34, is described more fully in the government's brief on appeal. Brief for Appellant 30–31 n.40.

**22.** Memorandum Opinion, *supra* note 9, at 1362–63, J.App. 33–34.

**23.** *Campana Corp. v. Harrison,* 114 F.2d 400, 406 (7th Cir. 1940). *See generally* J. Moore & J. Lucas, 5a Moore's Federal Practice ¶ 52.03[2] (1981).

**24.** Fed.R.Civ.P. 52; *United States v. Sheard,* 473 F.2d 139, 146 (D.C.Cir.1972), *cert. denied,* 412 U.S. 943, 93 S.Ct. 2784, 37 L.Ed.2d 404 (1973). *See generally* 5a J. Moore & J. Lucas, *supra* note 23, ¶ 52.03[1].

**25.** Order, *supra* note 3, J.App. 35. Although our review is based on an independent analysis of the legal issues, we acknowledge that our task was made easier by Judge Barrington D. Parker's careful and articulate Memorandum Opinion, *supra* note 9, and Amended Statement of Reasons, *supra* note 8.

**26.** The district court clarified the scope of its suppression order as follows:

It is only those statements secured from Hinckley by the FBI agents at the Washington Field Office between 7:00 and 7:30 p. m. that are suppressed. It also follows that the Court's ruling precludes any demeanor testimony by the agents concerning the manner in which Hinckley responded to their questions, as well as their perceptions of his responses. Likewise, this applies as to any testimony of government psychiatrists who may have later interviewed those agents and relied upon their accounts, impressions and reactions as to what occurred in arriving at their opinions and conclusions on the question of the defendant's responsibility.

Amended Statement of Reasons, *supra* note 8, at 521–523, J.App. 39–40. The government does not attack this ruling on scope except through its arguments on the merits of the suppression order as a whole, which we reject.

**27.** Memorandum Opinion, *supra* note 9, at 1351, J.App. 13.

**28.** *Id.;* J.App. 81 (PD–47 Form).

whether he had read his rights and (2) whether he understood his rights. However, in response to the third question, whether he wished to answer any questions, Hinckley answered orally: "I don't know. I'm not sure; I think I ought to talk to Joe Bates," explaining that Bates was his father's attorney in Dallas, Texas. In response to the fourth question, whether he was willing to answer questions without an attorney present, Hinckley again responded verbally: "I want to talk to you, *but first I want to talk to Joe Bates.*" [29]

Hinckley signed the PD–47 form at 3:10 p. m. He remained in the custody of the MPD until about 4:50 p. m., during which time he provided information necessary for police department booking and processing activities.[30] During this time, the police made efforts to contact the attorney he had requested, and Detective Myers assured Hinckley that such efforts were underway.

### 2. *FBI Custody*

The D.C. police were notified around 4:00 p. m. that the FBI would assume jurisdiction over the case because of the involvement of the President. At 4:50 p. m., two FBI agents—Henry Ragle and George Chi- mel—placed Hinckley under arrest for violation of the Presidential Assassination Statute. At roughly the same time, Detective Myers told the two agents that Hinckley had already asked for an attorney; that he did not want to make a statement without a lawyer present; and that the MPD was attempting to locate the attorney requested.[31] Secret Service Agent McCarthy also told the FBI that Hinckley had stated that he did not wish to make any statement until he had consulted with an attorney.[32]

Hinckley was taken to the FBI Washington Field Office at approximately 5:15 p. m. Upon arrival, he was advised of his *Miranda* rights through an FBI "Advice of Rights Form."[33] Although Hinckley signed his name below the waiver provision on the form, it was clearly understood, and the government does not here dispute, that Hinckley did not agree to waive his right not to answer questions or give a statement before consulting counsel.[34] Hinckley said at this time that he would answer questions [35] but that he would like first to speak with his parents, and supplied their phone number. Around the same time, Agent Chimel told Hinckley that the attorney he requested had been contacted and had recommended that Hinckley retain Vincent

---

**29.** Memorandum Opinion, *supra* note 9, at 1352, J.App. 14 (emphasis added); J.App. 82 (Form with Hinckley's answers); Transcript of Suppression Hearing at 235–36 (Oct. 26, 1981) (testimony of Detective Myers).

**30.** This information includes names, aliases, address, sex, race, date and place of birth, etc. J.App. 83 (MPD Form 163); J.App. 117 (MPD Form 255).

**31.** Memorandum Opinion, *supra* note 9, at 1352–53, J.App. 14–15.

**32.** *Id.* at 1352–1353, J.App. 15–16.

**33.** J.App. 54.

**34.** Memorandum Opinion, *supra* note 9, at 1352–53, J.App. 15. It was agreed that by his signature Hinckley was merely indicating that he understood his rights.

**35.** The government does not contend that Hinckley, by this action, waived his earlier invocation of his *Miranda* rights, and on the record before us the law would not support such a conclusion. The Supreme Court recently stat- ed that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards v. Arizona, supra* note 10, 451 U.S. at 484, 101 S.Ct. at 1884. "[U]nless the accused himself initiates further communication," *id.* at 485, 101 S.Ct. at 1885, a stringent waiver analysis must be applied. "[W]aivers of counsel must not only be voluntary, but constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused.'" *Id.* at 482, 100 S.Ct. at 1883–84 (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). *See generally* Note, *Sixth Amendment Right to Counsel: Standards for Knowing and Intelligent Pretrial Waivers,* 60 B.U. L.Rev. 738 (1980) (comparing fifth amendment waiver standards under *Miranda* with pretrial waiver standards under the sixth amendment).

Fuller, a Washington attorney. These events all took place before 6:00 p. m.[36]

The FBI then attempted to contact Hinckley's parents. However, the record does not show that any effort was made to contact Fuller during this period.[37] At 6:30 p. m., another attorney, Stuart Johnson, who had been alerted by a federal magistrate that he might be appointed to serve as counsel in an anticipated appearance of the accused, called the FBI office. He identified himself and sought access to Hinckley, but, according to his report, the agent he spoke with hung up on his inquiry. He persisted, and placed a call to an Assistant United States Attorney who told him to contact Fuller. When Fuller could not be reached, Johnson again called and talked to an Assistant United States Attorney. At 6:53 p. m., his request for access to Hinckley was finally granted and a car dispatched to bring him to the FBI field office.[38] Johnson arrived at 7:28 p. m., after first having been formally designated to serve as counsel to Hinckley by the federal magistrate.

### 3. *The Suppressed Statements*

At 7:00 p. m., Agent Stephen Colo of the Secret Service and Agent Ragle of the FBI approached Hinckley and asked him to respond to certain "background" questions. In response to this inquiry, Hinckley stated that he would answer questions[39] except for those about the period after his arrival in Washington, D.C. The "background" information secured over the next 25 minutes thus covered Hinckley's life up until his arrival in Washington.[40]

In response to questioning, Hinckley provided information about: his name, date of birth, place of birth, height, weight, and hair and eye color; his criminal record and social security number; his parents' names, address, and phone number; his father's employment; his brother's name, age, address, and employment; his sister's name, age, address, and children; and the name of his defense lawyer. Hinckley also answered questions about his marital status, his "closest friend" (he responded that he had none), his military service, his automobile make and tag number, his educational background, and his employment history.

In response to further questioning,[41] he discussed his activities over the preceding year, describing his erratic travel patterns, including the names, rough dates, and partial addresses of the hotels he had stayed at during this time, and describing how he had travelled between them. He also provided information about his medical problems, the treatments he had received for his thyroid condition, his consumption of valium, his psychiatric treatment (including the use of biofeedback), his lack of a sense of direction, and his relationship with his parents.

Hinckley then said that he wanted to stop the interview, and renewed his request for an attorney. However, after one FBI agent left the room and another replaced him, Secret Service Agent Colo asked additional questions. Specifically, he asked whether Hinckley had a "girlfriend"; Hinckley said that she really wasn't a "girl-

---

36. Memorandum Opinion, *supra* note 9, at 1352–53, J.App. 15.

37. *Id.*

38. *Id.* at 1353–54, J.App. 17; J.App. 93–95 (memorandum by attorney Johnson).

39. *See* note 35 *supra.*

40. Our summary of Hinckley's statements is based on Memorandum Opinion, *supra* note 9, at 1353–54, J.App. 16–17; J.App. 62–63 (Personal History Summary prepared by Agent Colo); J.App. 64–68 (transcript of Agent Colo's taped notes); J.App. 71–73 (memorandum of interview by Agent Colo); J.App. 74–80 (notes

of Agent Colo); J.App. 85–87 (FBI Form 302 of Agents Chimel and Ragle); J.App. 105–06 (continuation of same); J.App. 107–09 (Secret Service interview compilation).

41. The government claims that the information about the prior year's activities was provided by Hinckley in a "running type narrative," but the district court rejected this explanation as "simply not plausible." Memorandum Opinion, *supra* note 9, at 1353–54, J.App. 16–17. *But see* R. Royal & S. Schutt, The Gentle Art of Interviewing and Interrogation 33 (1976) ("Questions should generally be framed to require a narrative answer.").

friend," and that it was a one-sided relationship. Asked about a telephone number found in his wallet, Hinckley responded that it was the Yale dormitory number of Jodie Foster, a well-known actress. Hinckley stated that he had talked to Ms. Foster two or three times, that she was courteous, that he had taped the conversations, and that the tapes were in a suitcase in a D.C. hotel. At this point, 7:25 p. m., the interview ended. Three minutes later, the court-appointed attorney arrived at the FBI field office.

### B. Analysis

#### 1. Miranda's Per Se *Rule Against Interrogation*

■ In determining an arrestee's fifth amendment rights, the Supreme Court has established a bright line for law enforcement officers: "If the individual states that he wants an attorney, *the interrogation must cease* until an attorney is present." [42] As the Court has emphasized, *Miranda* created a "rigid rule that an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease." [43] Thus, if a defendant "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking *there can be no questioning*." [44] And, only last Term, the Court reaffirmed the continuing vitality of these proscriptions. In *Edwards v. Arizona*,[45] the Court stated that "an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself

initiates further communication, exchanges or conversations with the police." [46]

In this case it is undisputed that, once in custody, Hinckley stated that he wanted an attorney. Moreover, he did not initiate further communication, but rather only responded to police-initiated questioning undertaken in the face of Hinckley's expressed desire to remain silent until he had an attorney. The government attempts to bring the questioning here outside the scope of *Miranda*, but its arguments in this respect run afoul of both the facts and the applicable law.

#### 2. The Questioning in this Case is not Analogous to a Booking Procedure

■ The government argues that virtually all of the questioning that took place between 7:00 and 7:25 p. m. falls outside the scope of *Miranda's per se* rule because it was merely part of "standard processing procedures" and was "essentially administrative." [47] Indeed, the government analogizes the questioning to the collection of routine booking data by MPD Detective Myers immediately following the arrest.[48] Without here deciding whether, or under what circumstances, routine or administrative questions might be permissible despite an unfulfilled request for counsel,[49] we disagree—as did the district court [50]— with the government's innocuous characterization of the questioning that took place.

To begin with, the FBI does not customarily "book" defendants.[51] More importantly, the interview in this case bears little resemblance to a typical precinct booking. The standard booking process is "a predomi-

---

**42.** *Miranda v. Arizona, supra* note 10, 384 U.S. at 474, 86 S.Ct. at 1627 (emphasis added).

**43.** *Fare v. Michael C.,* 442 U.S. 707, 719, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197 (1979).

**44.** *Miranda v. Arizona, supra* note 10, 384 U.S. at 444–45, 86 S.Ct. at 1612–13 (emphasis added).

**45.** *Supra* note 10.

**46.** *Id.,* 451 U.S. at 484–85, 101 S.Ct. at 1885.

**47.** Reply Brief for Appellant at 13.

**48.** Brief for Appellant at 33.

**49.** *See* note 64 *infra.*

**50.** *See* Memorandum Opinion, *supra* note 9, at 1353–54, J.App. 16–17.

**51.** Transcript of Suppression Hearing at 78 (Oct. 26, 1981) (testimony of Agent Ragle); Memorandum Opinion, *supra* note 9, at 1356 n.28, J.App. 21 n.28.

nantly clerical procedure, performed immediately or soon after the suspect is delivered to the precinct or district station"; its primary function is "record-keeping."[52] The 25-minute interview of Hinckley by FBI and Secret Service agents, conducted five hours after he was first taken into custody, bore none of the indicia of a clerical operation. A true "booking" had been conducted at MPD headquarters, and this information was available to the federal agents. And we think it worthy of note that instead of immediately gathering record-keeping data after assuming jurisdiction over the case, the FBI and the Secret Service respected Hinckley's right to remain silent for over an hour before initiating the subsequent wide-ranging inquiry. In contrast, once Hinckley had requested counsel, MPD Detective Myers stopped his interrogation but immediately began the Police Department's routine processing questions.[53]

Significantly, testimony from the interviewing agents themselves demonstrates a clear investigatory purpose behind the questioning, rather than the "booking" analogy asserted in court. According to Secret Service Agent Colo, the questioning of Hinckley paralleled the standard interview of persons being investigated for threats against the President and other Secret Service protectees.[54] Such questioning is undertaken to determine if protectees are in danger, to discover if others are involved in an attempted assassination, and "to get the feeling of who this individual is."[55] The inquiries necessarily cover a vast territory since the goal is to determine the degree of danger a suspect poses to those the Secret Service protects.[56] Similarly, the FBI agent who conducted the interview admitted that he wanted to find out if Hinckley had acted alone or in concert with others.[57]

### 3. The Questioning Here Was an Interrogation

■ Intertwined with the government's "booking" analogy, but analytically separable from it, is the argument that although the incident here involved express questions, those questions were not designed to elicit an incriminating response and the interview is thus outside the scope of *Miranda's* requirement. A "core virtue of *Miranda*," however, is the "rigidity" and precision of its prophylactic rules.[58] The government's approach would greatly undermine this precision by carving out a massive exception for the far-ranging "background"

---

52. W. LaFave, Arrest 379–80 (1965).

53. *See* Transcript of Suppression Hearing at 239 (Oct. 26, 1981) (testimony of Detective Myers).

54. Transcript of Suppression Hearing at 174–75, 193 (Oct. 26, 1981) (testimony of Agent Colo).

55. *Id.* at 149, 193–94.

56. *See, e.g., id.* at 192–93 (background information includes financial relationships and problems, travels over the past year, doctors who have provided treatments, and relationship with parents); *Review of Secret Service Protective Measures, FY 76, Hearings Before the Senate Comm. on Appropriations, Subcomm. on Treasury, U.S. Postal Service and General Government Appropriations,* 94th Cong., 1st Sess. 88–90 (1975) (Background Investigations Guidelines) (range of inquiry includes a complete review of mental history of the subject with a summary of complaints, obsessions, delusions, and attitudes toward protectees).

57. Transcript of Suppression Hearing at 73 (Oct. 26, 1981) (testimony of Agent Ragle).

Other specifics of the interview deserve mention. For instance, the FBI apparently made no effort to contact attorney Fuller before questioning Hinckley, Memorandum Opinion, *supra* note 9, at 1352–53, J.App. 15, and the court-appointed attorney seems to have encountered some difficulty in securing access to Hinckley, *id.* at 1353–54, J.App. 17. *See* text accompanying notes 37–38 *supra.* Also, since the issue was not briefed, we do not address the relevance here of Fed.R.Crim.P. 5(a), which states that an arrested person shall be taken "without unnecessary delay before the nearest available federal magistrate." *See Mallory v. United States,* 354 U.S. 449, 454, 77 S.Ct. 1356, 1359, 1 L.Ed.2d 1479 (1957); *but see* Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 3501(c) (1976); 1 C. Wright, Federal Practice & Procedure (Criminal) § 72, at 63, 73 (1969) (Omnibus Act makes "drastic inroads" on *Mallory*).

58. *Fare v. Michael C.,* 439 U.S. 1310, 1314, 99 S.Ct. 3, 5, 58 L.Ed.2d 19 (1978) (on application for stay) (Rehnquist, J.).

interview conducted in this case. We think it ill-advised to depart so sweepingly from *Miranda's per se* rule.

Our conclusion fully accords with *Rhode Island v. Innis*,[59] in which the Supreme Court adopted a two-pronged standard for defining custodial interrogation:

> [T]he *Miranda* safeguards come into play whenever a person in custody is subjected to *either* express questioning *or* its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.[60]

The Court elaborated that by " 'incriminating response' we refer to *any response* —whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial." [61]

Applying this standard, the district court found it unnecessary to look beyond the first prong of the *Innis* doctrine since it determined that Hinckley had been subjected to "express questioning." [62] The government proposes [63] a different reading of *Innis*, however, and argues that "interrogation" does not include even *express* questioning when it is "not reasonably likely to elicit an incriminating response." We need not decide the correctness of this interpretation,[64] for even under such an approach we think it clear that the agents here were knowingly attempting to elicit "incriminating" responses, and reasonably likely to do so.

The federal agents who conducted the "background" interview of Hinckley would naturally have been aware of the likelihood that he would present an insanity defense.[65]

---

**59.** 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). In that case, the defendant had been arrested and had asserted his right to counsel. He was then placed in a police car to be driven to the central station in the company of three police officers. On the way, two officers in the car engaged in a conversation between themselves concerning the possibility that a handicapped child might find a missing shotgun that had been used in the crime. The defendant interrupted the conversation and directed the officers to the missing gun. The Court found that the conversation was short and not " 'evocative,' " *id.* at 303, 100 S.Ct. at 1691, and that there was no basis for concluding that the "officers' remarks were *designed* to elicit a response." *Id.* at 303 n.9, 100 S.Ct. at 1690 n.9 (emphasis in original). Here, on the other hand, we deal with *lengthy and express* questioning of the defendant.

**60.** *Id.* at 300–01, 100 S.Ct. at 1689–90 (emphasis added; footnotes omitted).

**61.** *Id.* at 301 n.5, 100 S.Ct. at 1689–90 n.5 (first emphasis added). *But see, e.g., Harris v. New York*, 401 U.S. 222, 224, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971) (*Miranda* does not bar prosecution's use of responses for impeachment purposes).

**62.** Memorandum Opinion, *supra* note 9, at 1356, J.App. 21.

**63.** *E.g.,* Brief for Appellant at 33.

**64.** The term "express questioning" might not cover questions by the police that are part of a routine processing procedure. *United States v. Foskey*, 636 F.2d 517, 522 n.3 (D.C.Cir.1980) (some questions, "though express questions, may not be considered part of 'express questioning,' " although *Innis* has not resolved this issue). *Compare United States v. Booth*, 669 F.2d 1231, at 1238 (9th Cir. 1981) ("routine" questions not within scope of *Miranda*) *with Proctor v. United States*, 404 F.2d 819, 820–21 (D.C.Cir.1968) (even "routine" questions can violate *Miranda*). *See also* ALI, A Model Code of Pre-Arraignment Procedure § 140.8(5) at 53 (1975) ("questioning" does not include, *e.g.,* are you hungry? would you like some food? are you hurt?).

**65.** We begin with the simple recognition that the attackers of Presidents are often mentally disturbed. J. Kirkham, S. Levy & W. Crotty, Assassination and Political Violence (Staff Report No. 8 to the National Comm'n on the Causes and Prevention of Violence) at 1 (1969). From Richard Lawrence, who imagined himself to be King Richard III of England and who attempted to shoot Andrew Jackson, *id.* at 50, to John Shrank, who thought himself an agent of God when he shot Theodore Roosevelt, *id.* at 57, to Lynette "Squeaky" Fromme, an attempted assassin of Gerald Ford, those who have tried to kill Presidents have often been of questionable sanity. This fact helps to explain why standard Secret Service interrogation deals with the mental history of a subject, *see* note 56 *supra,* and why Secret Service agents re-

Hinckley's psychological condition at the time of the shooting has predictably become the focus of the case. Because most details about an individual's background are relevant to a determination of sanity,[66] a systematic "background" interview necessarily elicits responses that the prosecution might want to introduce at trial.[67] Even more significantly, the agents' observations about Hinckley's demeanor during the interview are potentially a key ingredient of the government's rebuttal of the accused's insanity defense. Indeed, as the government itself argued to the district court, the agents are "prime lay witnesses" on the insanity issue; their testimony is "critical"; the government needs a foundation for the agents' demeanor testimony based on "the various statements" of the defendant during this period; and medical testimony after the fact may be less persuasive to a jury than immediate, on-the-scene observations by lay witnesses.[68]

Thus, where the mental state of an arrestee looms as a likely issue, we can only conclude that a systematic, 25-minute "background" interview was designed to elicit "incriminating" responses as defined in *Innis*. As a result, even under the government's view that interrogation covers express questions only when they are designed to elicit an incriminating response—a view that we do not here adopt, but discuss only for the sake of argument—we agree with the district court that Hinckley was subjected to a "custodial interrogation" in violation of *Miranda.*

The government has argued, as a fallback position, that even if the bulk of the 25-minute interview was contrary to *Miranda,* a discrete segment at the beginning consisting of only very basic identifying questions should be admissible.[69] Presumably, the government thereby hopes to allow its agents to offer demeanor testimony based on the permissible segment of the interview. We cannot accept the government's view of the divisibility of the interviewing process in this case. First, it is not clear that the record supports recognition of a discrete segment of basic questions at the outset of the interview.[70] More important-

---

ceive specific training to make assessments of the mental stability of interviewees, *see* Institute of Medicine, Behavioral Science and the Secret Service: Toward the Prevention of Assassination 20, 35 (1980). *Innis* specifically noted that the "unusual susceptibility of a defendant" to particular inquiries was one factor to consider in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response. *Supra* note 59, 446 U.S. at 302 n.8, 100 S.Ct. at 1690 n.8.

**66.** *See United States v. Brawner,* 471 F.2d 969, 994 (D.C.Cir.1972) (*en banc*) ("'all possibly relevant evidence' bearing on cognition, volition and capacity"); *United States v. Carr,* 437 F.2d 662, 663 (D.C.Cir.), *cert. denied,* 401 U.S. 920, 91 S.Ct. 907, 27 L.Ed.2d 823 (1970) ("complete" exploration of the mental state of the accused is needed when issue of sanity is raised).

**67.** Of course, besides being used to rebut an insanity defense, information provided as part of the "background" interview can also bear on the government's case-in-chief. For instance, information on the travel and pre-incident movements of the defendant may figure in the government's case. Moreover, there is often a thin line between the proof needed to show the intent required as an element of the crime and the proof used to rebut an insanity defense.

*See United States v. Brawner, supra* note 66, 471 F.2d at 998–1000.

**68.** Transcript of Suppression Hearing at 8 (Dec. 14, 1981) (statement of attorney Adelman addressing the court).

**69.** This severability argument is advanced in the government's brief, Brief for Appellant at 33–38, and was also put forth at oral argument. The government's position in this regard is made confusing by its assertion that "virtually all of the questions" asked are admissible, *id.* at 33, while at the same time it acknowledges that all of the questioning about Hinckley's whereabouts during the past year "arguably" may not be, *id.* at 35. The source of the difficulty is the government's continued characterization of the lengthy discussion about that year as a narrative given in response to a single question, despite the district court's finding of fact that this simply was not credible. *See* note 41 *supra.*

**70.** *Compare, e.g.,* J.App. 107 (Secret Service interview compilation) (stating that identifying information preceded account of year's activity) *with* J.App. 74–76 (Notes of Agent Colo) (showing, at J.App. 76, brother's name and address appearing in notes apart from other identifying information and after notes on

ly, all of the questioning had an investigatory purpose and, in the circumstances of this case, was likely to elicit responses or at least resulting demeanor testimony that the government could use at trial. We do not see any reason to sort out which questions might otherwise have been permissible under other circumstances, and we can discern no principle for admitting certain "background" questions but not others.[71] Nor do we see how the demeanor testimony of the agents can be divided into observations of demeanor based on permissible, as opposed to impermissible, questioning. Here, the entire 25-minute interview process violated *Miranda*, and the taint therefore pervades the whole process. We, of course, do not decide whether in other cases severability might be possible.

## II. THE SEARCH AND SEIZURE ISSUE

We next examine the admissibility of the handwritten document seized from Hinckley's cell. The district court concluded that this paper was read and confiscated in violation of the fourth amendment's guarantee that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."[72] Certain "trigger words" in the paper in question allegedly attracted the attention of a correctional officer as he sifted through Hinckley's papers in a search for contraband.[73] The

government contends that it was reasonable for the officer, having seen these "trigger words," to read through the document; and reasonable again for prison officials later to seize the document based on the knowledge of its contents thus obtained. We disagree and affirm the district court in its holding that the officer "had no basis for unfolding the document and reading it in its entirety."[74] Accordingly, we uphold the district court's judgment that the document must be suppressed.[75]

### A. Factual Background

Hinckley was transferred to the Federal Correctional Institution at Butner, North Carolina, on April 2, 1981 to undergo psychiatric evaluation. Formidable security measures were instituted during Hinckley's stay there: he was held in solitary confinement,[76] kept under round-the-clock supervision,[77] personally checked by guards every fifteen minutes,[78] accompanied by three officers every time he left a secured area,[79] restricted in his access to prison personnel,[80] and even prohibited from receiving mail except from designated individuals.[81] Upon arrival, he was advised by the Manager of the Mental Health Unit, Jesse James, that his cell would be frequently searched, primarily for "items with which he could harm himself,"[82] and that his mail (except for attorney-client mail and correspondence with certain officials) would be read.[83] In

account of year's activity, indicating that routine questions may have been interspersed with substantive questions). *But see* J.App. 59 (Notes of Agent Ragle) (showing brother's name and address with other identifying information).

71. *See* text accompanying notes 66–68 *supra*.

72. U.S.Const. amend. IV.

73. The federal regulations define contraband as "anything that an inmate is not authorized to possess in an institution." 28 C.F.R. § 500.1(h) (1980).

74. Memorandum Opinion, *supra* note 9, at 1362–63, J.App. 34. The district court did not discuss the warrant requirement.

75. *See Weeks v. United States*, 232 U.S. 383, 398, 34 S.Ct. 341, 346, 58 L.Ed. 652 (1914).

76. Transcript of Suppression Hearing at 55 (Oct. 19, 1981) (testimony of Jesse James).

77. *Id.* at 27.

78. *Id.* at 69.

79. *Id.* at 67.

80. *Id.* at 68.

81. *Id.* at 27.

82. *Id.* at 25.

83. *Id.* at 151–52. The district court found that Butner "search procedures distinguished between attorney-client mail and other mail: prison regulations prohibit the reading of attorney-client mail but place no restrictions on the

May, after Hinckley ingested a large quantity of medication in an apparent suicide attempt, the security measures were further intensified. Searches were increased to twice daily,[84] and he was transferred to a cell where he could be continually observed through a window in an adjoining guard station.[85]

Under continual observation, in solitary confinement, and with knowledge that all his personal correspondence would be read, Hinckley's exclusive outlet for private expression was his writing. He maintained a diary[86] and wrote notes on pads provided by the prison authorities.[87] Some of the correctional officers assigned to guard him read these papers during the cell searches—which were conducted in Hinckley's absence—although they had not been instructed to do so by anyone at Butner.[88] During a contraband search on Thursday, July 23, 1981, while correctional officer Donald Meece was looking through the contents of an unmarked envelope Hinckley had placed on an extra bed he normally used to store reading materials, correspondence, and per-

reading of non-attorney-client mail.... [T]he regulations do not recognize any category of documents as non-mail." Memorandum Opinion, *supra* note 9, at 1358, J.App. 26; *see* 28 C.F.R. Part 540, Subpart B—Correspondence (1980).

84. Transcript of Suppression Hearing at 338 (Oct. 20, 1981) (testimony of Paul Hungerford).

85. Transcript of Suppression Hearing at 97–98 (Oct. 19, 1981) (testimony of Jesse James).

86. Deposition of Paul Hungerford at 7 (Oct. 21, 1981).

87. Transcript of Suppression Hearing at 102 (Oct. 19, 1981) (testimony of Jesse James).

88. There was a conflict of testimony as to whether guards who searched Hinckley's cell thought they were authorized to read anything in it. Jesse James, the Manager of the Mental Health Unit, testified that he knew of no regulation that authorized reading private papers, *id.* at 60, that reading such papers was not part of the shakedown procedure, *id.* at 112, and that he was unaware of prison personnel ever reading any comparable materials, although officers would occasionally pick up "a word here or a word there" in the course of searching through papers for contraband. *Id.* at 113. Captain Paul Hungerford, who together with James jointly supervised the correctional officers in the Mental Health Unit, testified that he "wanted the officers to be especially alert for any suicide notes, indications that he had plans to harm himself or others." Transcript of Suppression Hearing at 339 (Oct. 20, 1981) (testimony of Paul Hungerford). He did not, however, in his memorandum on "Special Procedures for John Hinckley," authorize individual guards to indiscriminately read Hinckley's papers, but rather provided only that Hinckley's mail be inspected personally by James. J.App. 50. Nor did any of the officers who testified ever receive an authorization from him or any other Butner official to read papers in Hinckley's cell. Donald Meece, a correctional officer under the supervision of both James and Hungerford, however, thought that he was authorized to look through personal papers for evidence of "escape plans" and "suicidal tendencies," and did so on several occasions. Transcript of Suppression Hearing at 171–72 (Oct. 19, 1981) (testimony of Donald Meece). He testified that he had received such instructions during training at another federal institution, although he admitted that he was never told to skim inmate papers by anyone at Butner. *Id.* at 200–01. He said he did not know whether other officers read such papers, observing that correctional officers have their "own style" of conducting searches. *Id.* at 202. Officer Elmer Stone testified that "mail" was to be read but that he had never been instructed to read other handwritten materials. Transcript of Suppression Hearing at 264 (Oct. 19, 1981) (testimony of Elmer Stone). But, he added, "We can if we want to, if we feel it is necessary." *Id.* at 265. Officer Ronald Graham also testified that although he had never been told to read Hinckley's writings, he read Hinckley's diary daily for indications that Hinckley was planning suicide. Transcript of Suppression Hearing at 302–06 (Oct. 19, 1981) (testimony of Ronald Graham). The district court found that "[t]here was no policy or rule at Butner instructing correctional officers to read the personal papers of inmates." Memorandum Opinion, *supra* note 9, at 1361–62, J.App. 32. The prison rules on mail were not applicable. The government itself has argued that the document was clearly not a "communication." Supplemental Memorandum In Opposition to Defendant's Motion for Suppression of Evidence and Return of Illegally Seized Evidence (filed Oct. 26, 1981) at 2–3. Further, the institutional interests that support reading of outgoing prisoner mail are largely irrelevant to the inmate's non-mail personal writings, which except in most unusual circumstances, will not be the means by which security or order is jeopardized, crime perpetrated, or unauthorized business conducted. *See* 28 C.F.R. § 540.13(c) (1980).

sonal writings,[89] the officer's eye was caught by certain "trigger words" on folded sheets of personal notes. As a result of these "trigger words," Meece skimmed the complete document and showed it to Officer Elmer Stone, who was assisting the search.[90] Stone read the document, replaced it in the envelope, and reported the matter to their supervisor, James.[91]

The next day, Stone conducted the morning cell search with Officer Ronald Graham. Stone again read the document and then showed it to Graham.[92] The two reported on the contents of the document to Captain Paul Hungerford, who ordered the papers copied and replaced while Hinckley was at the gym.[93] Hungerford testified that he took precautions to conceal the search and seizure from Hinckley because he expected

that if Hinckley knew about it, he would be "bent out of shape" and would present a problem over the weekend when staff was at a minimum.[94]

On Monday, July 27, Hungerford met with the acting warden, and they decided to contact the Federal Bureau of Investigation.[95] That afternoon, Hungerford and an FBI agent seized the document and Hinckley's diary,[96] and left a receipt for Hinckley indicating that "contraband" had been seized.

### B. *Analysis*

■ The Supreme Court has not yet decided the extent to which convicted prisoners or pretrial detainees[97] are protected by the fourth amendment.[98] Courts of ap-

---

**89.** Transcript of Suppression Hearing at 131–32 (Oct. 19, 1981) (testimony of Jesse James).

**90.** Transcript of Suppression Hearing at 184–86 (Oct. 19, 1981) (testimony of Donald Meece).

**91.** Transcript of Suppression Hearing at 258–59 (Oct. 19, 1981) (testimony of Elmer Stone).

**92.** *Id.* at 260.

**93.** Transcript of Suppression Hearing at 340–43 (Oct. 20, 1981) (testimony of Paul Hungerford).

**94.** Deposition of Paul Hungerford at 25–26 (Oct. 21, 1981).

**95.** *Id.* at 15–18.

**96.** The government averred at oral argument that it does not seek to introduce Hinckley's diary at trial.

**97.** *Bell v. Wolfish*, 441 U.S. 520, 545–46 & n.28, 99 S.Ct. 1861, 1877–1878 & n.28, 60 L.Ed.2d 447 (1979), may be read to suggest that, because the institutional concerns are much the same in each instance, pretrial detainees have no greater fourth amendment protection than convicted prisoners. *See* Gianelli & Gilligan, *Prison Searches and Seizures: "Locking" the Fourth Amendment Out of Correctional Facilities*, 62 Va.L.Rev. 1045, 1072 (1976).

**98.** *See* J. Gobert & N. Cohen, Rights of Prisoners 167 (1981); 3 W. LaFave, Search and Seizure 78 (Supp.1981). In *Lanza v. New York*, 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962), the defendant was convicted of refusing to answer questions of a legislative committee after he had been granted immunity from prosecution. He challenged the conviction on the ground that the questions asked were based on

the illegal electronic interception of a conversation between the defendant and his brother held in the visiting room of a jail where his brother was incarcerated. "The ultimate disposition of [the] case" rested on the record evidence "that at least two of the questions . . . were not related in any way to the intercepted conversation." *Id.* at 145, 82 S.Ct. at 1222. But Justice Stewart's opinion suggested in dicta that prisoners lack the privacy interests protected by the fourth amendment: "without attempting to define or to predict the ultimate scope of Fourth Amendment protection, it is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room." *Id.* at 143, 82 S.Ct. at 1221. The continued validity of the *Lanza* reasoning, however, must be considered in light of *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), also written by Justice Stewart, which specifically rejected the "constitutionally protected area" test, *id.* at 350, 88 S.Ct. at 510; *see* J. Gobert & N. Cohen, *supra*, at 169; and announced the view, which has subsequently been characterized as a "reasonable" or "legitimate expectation of privacy" standard, *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979), that "the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz v. United States*, 389 U.S. at 351–52, 88 S.Ct. at 511 (citations omitted). The opinion concludes that, "[w]herever a man may be, he is entitled to know that he will remain free from unreasonable searches and seizures." *Id.* at 359, 88 S.Ct. at 515. *Katz,* however, concerned

peals, however, relying generally on Supreme Court precedent in related areas, have ruled that prisoners retain some remnant of fourth amendment rights consistent with the legitimate demands of prison security.[99] The district court adopted this premise, and we agree. Other constitutional rights, once regarded as forfeited upon incarceration, have been recognized by the Supreme Court as surviving in some form in a prison atmosphere: "though his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned .... There is no iron curtain drawn between the Constitution and the prisons of this country."[100] The fourth amendment by its very terms envisions an accommodation between the right to privacy and the circumstances in which that right is asserted: "analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' "[101] Reasonableness in turn depends " 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference.' "[102] There is, therefore, no inherent conflict between the fourth amendment's requirements and the realties of institutional confinement. Rather, the preeminent value underlying the fourth amendment, the right to freedom from arbitrary interference with privacy, must and can be recognized even in a detention context. "The fourth amendment was adopted in reaction to the issuance of general warrants that gave government agents unfettered discretion to conduct searches and to seize property, thereby placing 'the liberty of every man in the hands of every petty officer.' "[103] Although "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security,"[104] that discretion should and must be corralled by the fourth amendment's prohibition of arbitrary invasions of privacy.

warrantless electronic surveillance of a telephone conversation conducted from a phone booth and did not directly address prisoner fourth amendment rights. Justice Rehnquist's majority opinion in *Bell v. Wolfish, supra* note 97, expressly avoided ruling on the issue. While suggesting that the *Lanza* reasoning could support the argument "that a person confined in a detention facility has no reasonable expectation of privacy with respect to his room or cell and that therefore the Fourth Amendment provides no protection for such a person," *id.* 441 U.S. at 556–57, 99 S. Ct. at 1883, his opinion proceeded on the assumption, *arguendo*, that a pretrial detainee might retain some reasonable "expectation of privacy," diminished by "the realities of institutional confinement." *Id.* at 557, 99 S.Ct. at 1883.

99. *See, e.g., United States v. Stumes,* 549 F.2d 831, 832 (8th Cir. 1977) (relying on *Katz v. United States, supra* note 98); *United States v. Savage,* 482 F.2d 1371, 1372–73 (9th Cir. 1973) (same), *cert. denied,* 415 U.S. 932, 94 S.Ct. 1446, 39 L.Ed.2d 491 (1974); *United States v. Lilly,* 576 F.2d 1240, 1244 (5th Cir. 1978) (relying on *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)); *United States v. Ready,* 574 F.2d 1009, 1013 (10th Cir. 1978) (same); *Sostre v. Preiser,* 519 F.2d 763, 764 (2d Cir. 1975) (same); *Bonner v. Coughlin,* 517 F.2d 1311, 1315 (7th Cir. 1975) (same),

*modified in part on other grounds,* 545 F.2d 565 (7th Cir. 1976), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978). *But see United States v. Hitchcock,* 467 F.2d 1107 (9th Cir. 1972) (decided before *Wolff v. McDonnell, supra*), *cert. denied,* 410 U.S. 916, 93 S.Ct. 973, 35 L.Ed.2d 279 (1973).

100. *Wolff v. McDonnell, supra* note 99, 418 U.S. at 555–56, 94 S.Ct. at 2974–75. *See, e.g., Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (religious freedom); *Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971) (access to courts); *Lee v. Washington,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (equal protection).

101. *Pennsylvania v. Mimms,* 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977) (quoting *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968)).

102. *Id.* 434 U.S. at 109, 98 S.Ct. at 332 (quoting *United States v. Brignoni-Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975)).

103. *United States v. Lilly, supra* note 99, 576 F.2d at 1244 (quoting *Boyd v. United States,* 116 U.S. 616, 625, 65 S.Ct. 524, 529, 29 L.Ed. 746 (1886)).

104. *Bell v. Wolfish, supra* note 97, 441 U.S. at 547, 99 S.Ct. at 1878.

■ Proceeding on that premise, the district court held that "the residuum of Fourth Amendment protection afforded Hinckley as a pretrial detainee exceeded that recognized by the Butner officers in their search of his cell."[105] Analyzing Hinckley's right to privacy in his personal notes, the court considered both Hinckley's subjective expectation of privacy and the objective reasonableness of his interest in security from their search and seizure. The court found that Hinckley had taken the only precautions available to him to preserve the confidentiality of his papers: he folded them and placed them in a large envelope with personal letters and his attorney-client materials.[106] Further, Hinckley had never been informed that his personal papers would be read. Nevertheless, his guards, on their own initiative, engaged in an "indiscriminate search and reading" of these papers.[107] Objectively, the court determined that such conduct was unreasonable.[108] Because the guards were not act-

**105.** Memorandum Opinion, *supra* note 9, at 1360–61, J.App. 30.

**106.** Memorandum Opinion, *supra* note 9, at 1360–61, J.App. 30. *Cf. United States v. Vallez*, 653 F.2d 403, 406 (9th Cir. 1981) ("This court has ruled ... that a prison inmate does have a reasonable expectation of privacy in a sealed letter." (citing *United States v. Savage, supra* note 99, 482 F.2d at 1373)); *Bonner v. Coughlin, supra* note 99, 517 F.2d at 1317 (in civil rights suit, prison administration must establish the reasonableness of seizing envelope containing prisoner's trial transcript).

**107.** Memorandum Opinion; *supra* note 9, at 1358, 29, J.App. 25, 29.

**108.** *Cf. Procunier v. Martinez*, 416 U.S. 396, 415, 94 S.Ct. 1800, 1812, 40 L.Ed.2d 224 (1974) (striking down prison regulation that allowed "prison officials and employees to apply their own personal prejudices and opinions as standards").

In *Bell v. Wolfish, supra* note 97, Justice Rehnquist restated the fourth amendment's reasonableness standard in the context of a challenge by pretrial detainees to search procedures: "In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." 441 U.S. at 559, 99 S.Ct. at 1884. Under this formulation, the Court upheld the reasonableness of visual body-cavity inspections of prisoners conducted after every contact visit with a person from outside the institution, whether or not there was probable cause to believe an inmate was concealing contraband. The prison administration justified the practice as necessary to discover and "deter the smuggling of weapons, drugs, and other contraband into the institution." *Id.* at 558, 99 S.Ct. at 1884. Justice Rehnquist observed that "inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record." *Id.* at 559, 99 S.Ct. at 1884. The Court was thus satisfied that action against the means by which contraband was introduced into the institution was reasonable, despite the degree of intrusion on personal privacy, as long as the search was not conducted in an "abusive fashion." *Id.* at 560, 99 S.Ct. at 1885. *Wolfish* also upheld a rule that prohibited detainees from observing routinely conducted searches for contraband in inmate living quarters. The Court found that, as "[d]etainees' drawers, beds, and personal items may be searched" without a warrant, "[t]he rule itself [did] not render the searches unreasonable." *Id.* at 557, 99 S.Ct. at 1883–84. "Permitting detainees to observe the searches does not lessen the invasion of their privacy; its only conceivable beneficial effect would be to prevent theft or misuse by those conducting the search. The room-search rule simply facilitates the safe and effective performance of the search which all concede may be conducted." *Id.* at 557, 99 S.Ct. at 1883.

*Wolfish* unequivocally tells us that even major invasions of personal privacy can be justified by demonstrated institutional needs. *Wolfish*, however, provides scant guidance in the present case as to how to balance "the scope of the particular intrusion, the manner in which it [was] conducted, [and] the justification for initiating it." The institutional interests in the *Wolfish* decision are not directly relevant here. It is difficult to see how Hinckley's writings are in any real sense the means by which legitimate institutional interests are jeopardized; he does not contest the reasonableness of searches for contraband nor insist that he should have been present while they were conducted. *Wolfish* did not speak to the legitimacy of searching all private writings of prisoners, for whatever reason. Neither did *Wolfish* address the kind of *ad hoc* search procedures present here, which implicate the fourth amendment's purpose of limiting the discretion of individual officers to make serious intrusions upon personal privacy. In *New York v. Belton*, —— U.S. ——, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), however, the Supreme Court did stress the importance of standardized rules set out in advance, in the context of

ing in accord with an established institutional practice or policy that such reading was necessary to maintain institutional or inmate security, there was no reasoned, principled decision by the prison administration entitled to deference. Instead, a serious invasion of Hinckley's right to privacy in his own papers was perpetrated by individual officers unguided by prison rules or even the instructions of their superiors.

The government contends, however, that even if the routine reading of Hinckley's papers was not proper, the reading and seizure of the specific document involved in this appeal was reasonable under the circumstances because, while sorting through papers during an authorized search for contraband, Officer Meece saw words that triggered an institutional need for further investigation.[109] We do not doubt that it may be entirely reasonable for individual officers to act on their own initiative to ensure internal security if they perceive circumstances requiring immediate response;[110] nor do we deny that the "plain view" doctrine might authorize a seizure and further reading, if, in the course of sifting through papers, an officer noticed words that indicated a crime in planning or danger to the inmate or others.[111] But the facts in this case, as found by the district court, do not fit either pattern. The district court found that the phrases in Hinckley's papers that captured the attention of Officer Meece "neither suggested a threat of criminal activity" nor implicated " 'special considerations peculiar to the penal system.' "[112] Officer Meece's testimony is pivotal because it

searches incident to a lawful arrest. The Court noted that such rules allow an individual to "know the scope of his constitutional protection," and more importantly here, they allow "a policeman [to] know the scope of his authority." *Id.* at —— U.S. at ——, 101 S.Ct. at 2864.

109. We note that the "trigger words" justification was raised for the first time the day before the suppression hearing. Transcript of Suppression Hearing at 8–11 (Oct. 19, 1981) (statement of attorney Adelman addressing the court). The court expressed surprise that the issue had not come to the government's attention significantly earlier. *Id.* at 13. Government counsel's explanation was that the witnesses had not seen the documents since the seizure. *Id.* at 14. In later depositions, defense counsel learned that, in preparation for their testimony at the hearing, the witnesses had refreshed their recollections by reviewing the document for the words that had allegedly attracted their attention at the time the document was discovered.

110. *Cf. Terry v. Ohio, supra* note 101 (minimally intrusive action within individual officer's discretion when officer has articulable basis to believe crime about to be committed).

111. In *Diguiseppe v. Ward,* 514 F.Supp. 503, 505 (S.D.N.Y.1981), the court aptly observed: We begin with the proposition that it was proper to search for contraband, and we assume that it was necessary to leaf through the pages of [the inmate's] diary to be sure that it contained no easily concealed contraband, such as razor blades. It was therefore virtually inevitable that the searcher's eye would catch isolated words and phrases. We further assume that if any isolated word or phrase thus observed gave rise to the reason-

able expectation that the diary contained information concerning imminent danger to inmate safety or prison security, it would be reasonable for the searcher to read on.

112. Memorandum Opinion, *supra* note 9, at 1362, J.App. 33. The government nonetheless suggests that the trigger words could reasonably raise concerns about Hinckley's mental state that might justify reading on through the document. In this regard, we do not dispute the governmental interest in safeguarding Hinckley's welfare. "[T]he government has a substantial interest in ensuring that persons accused of crimes are available for trials . . . ." *Bell v. Wolfish, supra* note 97, 441 U.S. at 534, 99 S.Ct. at 1871. "Obviously, a corollary and more humane governmental interest is also present: if detention in the jail is required for any purpose, and if there is reason to believe [the prisoner] may be disposed to suicide, the jail keeper is obliged to exercise his control over [the prisoner's] environment in such a way as to protect [him] from [himself] during [his] detention." *Vienneau v. Shanks,* 425 F.Supp. 676, 679–80 (W.D.Wis.1977). We are also aware that an enhanced concern for Hinckley's safety resulting in increased precautions was certainly justified by his suicide attempt in May. The suicide rate among survivors of one attempt is apparently significantly higher than the suicide rate in the general population. *See* Greenberg, *Involuntary Psychiatric Commitments to Prevent Suicide,* 49 N.Y.U. L.Rev. 227, 239 (1974). Here, however, we must conclude that the trigger words did not suggest anything approaching a declaration of suicidal intentions that might have legitimized perusal of the rest of Hinckley's notes. In short, the strength of the governmental interest in the detainee's security cannot transform or-

was he alone who first discovered and read the document. All subsequent readings and interest in the paper flowed from information initially provided by Meece. The only words that Meece firmly remembers having seen before he read the entire document are "prison," "life sentence," and "cooperation with the Justice Department."[113] These words, as the district court found, are hardly of a nature that suggests an imminent or even remote threat to security, particularly in view of the extraordinary security measures already in place. There was thus no readily discernible reason that justifies the subsequent reading of the entire document by the individual officers.

## III. ADMISSIBILITY OF EVIDENCE TO REBUT THE INSANITY DEFENSE

We turn finally to the government's contention that, even if the evidence that is the subject of this appeal was obtained in violation of Hinckley's constitutional rights, its use should be permitted at trial for what the government styles a limited purpose—namely, to rebut the insanity defense on which Hinckley is expected to rely. As we noted at the outset, the government's arguments in this regard are novel; they strain logic and have no foundation in law, and we consequently reject them.[114]

■ The government urges, to begin with, that the exclusionary rule applies only when the government seeks to use evidence to prove the basic elements of a crime. Reasoning broadly that because insanity is an affirmative defense, and proof of sanity is therefore not part of the prosecution's case-in-chief,[115] the government asserts that illegally obtained evidence can be used generally to rebut an insanity defense without jeopardizing constitutional principles.[116]

dinary words into danger signals sufficient to justify overriding fourth amendment rights. If indeed concerns were raised by these words when read by officers with no psychiatric training, their concerns could have been promptly communicated to mental health personnel to see if further action was appropriate with regard to the writings. *Cf. Vienneau v. Shanks, supra,* 425 F.Supp. at 680:

> There is available to them the other means apparently already being employed: isolation, constant observation, control of the contents of the cell, periodic searches of the cell, control of visitation, and physical inspection of the envelopes or packages received by the [prisoner]. Of course, such precautions are not certain to succeed, but they hold a considerable probability of success. Conceivably, a particular outgoing letter from the [prisoner] might contain information detailed enough to permit [prison administrators] to adopt more specific preventive measures at specific times. But this possibility must surely be deemed remote.

**113.** Deposition of Donald Meece at 11 (Oct. 20, 1981).

**114.** The district court also addressed these arguments, and did so in a careful and comprehensive manner that has facilitated our review here. Amended Statement of Reasons, *supra* note 8, at 522–25, J.App. 40–46.

**115.** Under the District of Columbia Court Reform and Criminal Procedure Act, Hinckley bears the burden of proving insanity, 24 D.C. Code Ann. § 301(j) (1981), but it remains unde-

cided in this circuit whether the Act applies to "offenses committed in the District of Columbia which are not violations of the D.C.Code but are violations of the United States Code." *United States v. Brawner, supra* note 66, 471 F.2d at 996; *see United States v. Greene,* 489 F.2d 1145, 1153 (D.C.Cir.1973). Were it not to, the government would continue to carry the burden of proving the defendant's sanity beyond a reasonable doubt once the defendant had raised the issue. *See Davis v. United States,* 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895).

**116.** The government's primary support for its position comes from a reading of *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), which we cannot accept. In *Estelle,* the Court held that evidence resulting from a compelled psychiatric examination imposed without adequate *Miranda* warnings could not be introduced at the sentencing phase of a trial. Thus, the Court decided that the prohibition against the use of evidence obtained in violation of *Miranda* protections was not expressly confined to the phases of the proceedings dealing with adjudication of guilt. However, for purposes of its argument here, the government relies on language in *Estelle* indicating that, once sanity is put in issue, a defendant can be required to submit to a sanity examination conducted by the prosecution's psychiatrist:

> When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State

The government stresses the inherently difficult nature of an insanity defense determination, and the concomitant need of the court to consider all available evidence on the issue.

Although it is true that in certain limited situations the Supreme Court has allowed the use of illegally obtained evidence for purposes collateral to direct proof of guilt,[117] an extension of such rulings to encompass the government's theory here would do wholesale violence to the rationale of these decisions and the underlying purposes of the fourth and fifth amendments. With respect to the fifth amendment, we cannot accept the government's contention that *Miranda's* deterrence rationale is adequately satisfied if the government is prohibited from using the illegally obtained evidence in its "case-in-chief" in a case of this kind. At the least, such a contention surely does not comport with reality in the world of an FBI or Secret Service agent. We are not confronted here with the typical police officer, but rather with the special concerns of highly trained agents whose job it is to prevent and investigate assassination attempts on major political figures. Such agents, we can assume, are fully aware of the critical importance of their demeanor testimony about a suspect arrested in the course of an attempted or actual

of the only effective means it has of controverting his proof on an issue that he interjected into the case. Accordingly, several courts of appeals have held that, under such circumstances, a defendant can be required to submit to a sanity examination conducted by the prosecution's psychiatrist. *Id.* at 465, 101 S.Ct. at 1874; *accord, United States v. Whitlock,* 663 F.2d 1094, 1106–07 (D.C.Cir.1980). We see, however, a vast difference between compelling a psychiatric examination as the only effective means to counter a defendant's assertion of insanity and allowing the use of lay testimony obtained in violation of *Miranda* generally to rebut a defendant's insanity defense. We note in this regard that the psychiatric examination itself is surrounded with procedural safeguards. *E.g., Washington v. United States,* 390 F.2d 444, 455–58 (D.C.Cir. 1967) (setting forth required explanatory instruction to psychiatrists).

The government also relies on two court of appeals decisions which, on careful reading, do not support its position. In *Jacks v. Duckworth,* 651 F.2d 480 (7th Cir. 1981), illegally obtained evidence used for impeachment purposes was also admitted for the jury's consideration of the accused's mental condition. The court of appeals, although it upheld the resulting conviction in a habeas corpus proceeding, was careful to note both that the defendant had failed to object at trial, *id.* at 484, and that its review in a habeas corpus proceeding was limited, *id.* at 485. *United States v. Trujillo,* 578 F.2d 285 (10th Cir.), *cert. denied,* 439 U.S. 858, 99 S.Ct. 175, 58 L.Ed.2d 166 (1978), involved a situation only facially similar to that in the present case. Trujillo was charged with making false statements in the acquisition of a firearm, and at trial, the major question was his sanity at the time of the alleged offense. An FBI agent testified about Trujillo's demeanor during the time that he answered routine identification questions, and in the course of testimony indicated that Trujillo had asked to see an attorney before answering further questions. There was absolutely no contention that the agent testified about statements taken in violation of *Miranda*; rather, the issue on appeal was whether the FBI agent's comment on Trujillo's request for an attorney unconstitutionally infringed on his right to remain silent. The court of appeals held that under the circumstances, it did not. *Id.* at 288.

117. The Supreme Court has permitted the use of tainted evidence for three purposes collateral to the prosecution's case-in-chief: for impeachment of a defendant's direct or cross-examination testimony, to locate witnesses identified in the illegally obtained evidence, and in questioning a witness during grand jury proceedings. *United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980) (impeachment); *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975) (impeachment); *Harris v. New York, supra* note 61 (impeachment); *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974) (locating a witness); *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (as the basis for questioning in a grand jury proceeding when the witness had been granted full transactional immunity). The only one of these situations at all similar to the government's proposed use of tainted evidence is impeachment of a defendant's testimony. Such use has been strictly limited to impeachment purposes, however, and the rationale of this exception to the exclusionary rule is that "[t]he shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Harris v. New York, supra* note 61, 401 U.S. at 226, 91 S.Ct. at 646. This rationale simply will not support the government's desire to extend the exception to include use of tainted evidence for rebutting the substance of a defendant's testimony.

**134**

assassination. And, ironically, the very broad scope of evidence that may be relevant to an insanity defense—cited by the government as a reason to dispense with *Miranda's* protections—will serve to enhance the possibility that any retreat from those protections will be abused. We thus find no reason for countenancing a broad exception to the Supreme Court's clearly enunciated policy against the use of tainted evidence simply because that evidence will be used to counter an insanity defense.

Were we to curtail the exclusionary rule in the drastic manner the government urges, we would provide little or no deterrence of constitutional violations against defendants whose sanity is the principal issue in the case. The government would be able, under the guise of rebuttal, to use any illegally obtained evidence relevant to the principal issue in the case—insanity.

█ The government's final argument for admission is based on a "testimony-by-proxy" theory. According to its view, if in the course of an insanity plea the defense puts forth testimony by expert witnesses on the defendant's mental state, that testimony is tantamount to the defendant taking the stand himself. Since it has been held permissible to use illegally obtained evidence to *impeach* testimony by the defendant, the government argues that it should also be possible to use the same testimony to *rebut* the expert psychiatric witnesses. In our view this theory cuts too wide a swath. Although it is indeed true that if a defendant takes the stand and testifies in a manner contradicted by illegally obtained evidence, that evidence can be used for the limited purpose of impeachment,[118] there is as yet no basis in law for converting this limited exception into a general license to use illegally obtained evidence for rebuttal purposes.[119] And if there were, the government does not adequately explain why it would single out the insanity defense for application of the testimony-by-proxy theory. All defense testimony is in a sense testimony by proxy, yet the government concedes that it would not seek to apply its rebuttal theory to an alibi or other affirmative defenses. We can find no reason for such a distinction.

For the foregoing reasons, the portions of the district court's order herein appealed are

*Affirmed.*

---

**118.** *United States v. Havens, supra* note 117; *Oregon v. Hass, supra* note 117; *Harris v. New York, supra* note 61.

**119.** In light of the district court's Amended Statement of Reasons, *supra* note 8, we read the suppression order as inapplicable should Hinckley testify at trial and in doing so make false statements about suppressed evidence;

that evidence could then be admitted for the limited purpose of impeachment. This applies not only to the statements taken in violation of *Miranda, see* note 117 *supra,* but also to physical evidence such as the documents seized from Hinckley's cell. *Walder v. United States,* 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954).