**Rafael E. CHIRINO, Petitioner,**

v.

**NATIONAL TRANSPORTATION SAFETY BOARD and Secretary of Transportation, et al., Respondents.**

**No. 87–1512.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 2, 1988.

Decided July 1, 1988.

As Amended July 7, 1988.

---

James W. Johnson, with whom Gary Green, Washington, D.C., was on the brief, for petitioner.

Karen R. Bury, Atty., F.A.A., with whom Peter J. Lynch, Manager, Enforcement Proceedings Branch, F.A.A., Washington, D.C., was on the brief, for respondents.

Before STARR and WILLIAMS, Circuit Judges, and WEIGEL[*], Senior District Judge.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This is a petition for review of an order of the National Transportation Safety Board revoking a pilot's airman certificates for violations of the Federal Aviation Regulations and a subsequent order of the Board denying a petition for reconsideration or rehearing. For the reasons that follow, we uphold the Board's orders and deny the petition for review.

## I

Rafael Chirino, an Eastern Airlines pilot, was charged with violating the Federal Aviation Regulations ("FAR") by knowingly causing false statements to be made on his application for a Boeing 727 aircraft type rating.[1] Chirino had presented a par-

---

[*] Of the U.S. District Court for the Northern District of California, sitting by designation pursuant to 28 U.S.C. § 294(d).

1. 14 C.F.R. § 61.59(a) provides, in part, as follows:

(a) No person may make or cause to be made—

(1) Any fraudulent or intentionally false statement on any application for a certificate, rating, or duplicate thereof, issued under this part;

(2) Any fraudulent or intentionally false entry in any logbook, record, or report that is required to be kept, made, or used, to show compliance with any requirement for the issuance, or exercise of the privileges, or any certificate or rating under this part.

An aircraft type rating certifies an otherwise qualified crew member to operate a particular aircraft.

tially completed rating application to Eduardo Baro, then an FAA Inspector. Inspector Baro filled in the remaining portion, indicating that Pilot Chirino had successfully completed two separate tests to obtain the 727 type rating. Specifically, the completed application indicated that Chirino passed a check ride in a simulator on May 6, 1985 and a flight check in an actual Boeing 727 on May 10, 1985. According to the FAA, Inspector Baro had not in fact tested Chirino in either a flight simulator or a 727 aircraft.

The FAA alleged that the fraudulent application demonstrated that Chirino lacked good moral character, a bedrock requirement mandated by FAR sections 61.151(b) and 143.9; in consequence, the FAA asserted, Chirino lacked the qualifications to hold any type of airman certificate. In November 1986, the FAA Administrator issued an emergency order revoking all of Chirino's airman certificates by virtue of the alleged violations. *See* §§ 609(a) and 1005(a) of the Federal Aviation Act, 49 U.S.C.App. §§ 1429(a) and 1485(a) (1982).

Chirino appealed the Administrator's action to the National Transportation Safety Board. At an ensuing hearing before an Administrative Law Judge, the FAA alleged that Inspector Baro was engaged in a scheme to "sell" type ratings to several airmen. The FAA showed that, in view of Chirino's lack of prior training for the 727 aircraft, he could not be certified for a Boeing 727 type rating without an actual flight check, which Chirino had not received.[2] To establish Chirino's complicity in the scheme, the FAA sought to show that the pilot knew he could not qualify for the rating without a flight check. *See supra* note 2. The FAA also introduced into evidence a check signed by Chirino in the amount of $2,000 made payable to Inspector Baro. On the check, Chirino had made the notation, "loan." The FAA, in addition, sought to show that no simulator check had ever taken place; specifically, the FAA established that Eastern had no record of simulator time being rented either by Inspector Baro or by Chirino during the relevant period.

Chirino defended against the charges on the basis that he had not "caused" any false entries to be made on the application. Chirino acknowledged that he could not be qualified for a Boeing 727 type rating without an actual flight check, but asserted that he reasonably believed at the time, based in part on his discussions with Inspector Baro, that he could obtain a type rating without such a check. According to his testimony, Chirino believed that pilots at Eastern had been able to obtain certification based on a simulator check alone. *See supra* note 2. Chirino thus maintained that he had been an innocent victim of Inspector Baro's scheme and that he had been duped into believing that he had lawfully secured the 727 certification.

In this regard, Chirino claimed that he did in fact receive a simulator check as indicated on his application. To buttress his contention, Chirino called as a witness Stuart Goldstein, an aviation attorney in Miami. Goldstein testified that he had observed Chirino and Inspector Baro in the flight simulator together, although he could not tell whether the Inspector was giving Chirino a check ride or simply training him. As to the tell-tale "loan" trumpeted by the FAA, Chirino acknowledged the payment to Baro, but stated that he believed the payment was to cover the cost of renting a simulator. As to the curious notation on the check, Chirino testified that he had entered the "loan" notation merely to accommodate Inspector Baro's request.

Finally, Chirino called Inspector Baro to testify. By this time, however, the latter had been fired by the FAA and was under federal criminal indictment in connection with fraudulently issuing ratings to three Eastern pilots, including Chirino. At Chirino's hearing Baro refused to testify, invok-

**2.** Although Appendix H to Part 121 of the FAR provides that a pilot may obtain a type rating in a simulator alone by receiving company training pursuant to those provisions, Chirino had received no such training at the time of his application. (The Administrator adduced evidence to the effect that it is common knowledge among pilots within the industry and at Eastern that such training is necessary to become certified without an actual flight check.)

ing his Fifth Amendment privilege against compelled self-incrimination.

At the conclusion of the hearing, the ALJ issued an oral decision reversing the FAA's emergency order of revocation. The heart of the case, as the ALJ saw it, was whether Inspector Baro's false statements on the application could be imputed to Chirino. J.A. at 19. By virtue of the burden of proof resting on the Administrator, the ALJ concluded that he could not find that Chirino was a *knowing* participant in the scheme. J.A. at 22. The ALJ reasoned that he could not "disbelieve both Mr. Goldstein and [Chirino] on the issue of whether or not the simulator check test was given" and found specifically that Inspector Baro administered the test to Chirino. The ALJ concluded as follows:

> [Chirino] has been open and cadid [sic] and honest in his testimony here today.... [Chirino] relied, to his detriment, on the Inspector's word that he could get this type of rating for [Chirino].
>
> In the final analysis, I do not see any evidence before me that imputes the actions of Inspector Baro to [Chirino].... The Inspector made a series of false statements. [Chirino] had no knowledge of those statements being false.

J.A. at 21–23.

On appeal, the NTSB unanimously reversed. NTSB Order No. EA–2457 (Jan. 27, 1987). First, the Board found that the ALJ erred in giving dispositive weight to the testimony of Messrs. Chirino and Goldstein as to the simulator check. Indeed, the Board concluded that the ALJ made a critical mistake in evaluating Goldstein's testimony; specifically, the NTSB found that "contrary to the law judge's apparent belief that [Goldstein] verified that a simulator check had been given to [Chirino], the witness clearly indicated that he did not know whether respondent was engaged in a simulator check ride or just training in the simulator." J.A. at 5 (footnote omit-

ted). This error, the NTSB concluded, invalidated the ALJ's credibility determination and required the Board to weigh the evidence itself. Based on its own review, the Board concluded that no simulator check had in fact been given. J.A. at 6. The NTSB pointed in particular to Eastern's records which failed to show that its equipment had been rented for a simulator test, and to the testimony of a former FAA official that, based on Chirino's experience and training at the time, the pilot had a "zero" chance of passing a simulator check for a 727 rating. *Id.*[3]

Second, the Board condemned Chirino's pivotal testimony (that he believed that he could obtain 727 certification through a simulator test only) as "inherently incredible," J.A. at 8; indeed, in the Board's view, "any such belief would have to have been the product of purposeful ignorance," J.A. at 7, particularly when "even the most casual reading of [the relevant regulations] would have dispelled" any such belief. J.A. at 8. Accordingly, the Board concluded that "an airman with [Chirino]'s numerous certificates and long term aviation experience would be at least knowledgeable, if not intimately familiar, with a matter such as this bearing so directly and fundamentally on career advancement as an airline pilot." J.A. at 7. Although Chirino testified that he knew of Eastern captains who had qualified for certification without an actual flight check, the Board observed that only captains who had undergone a special Eastern training program were eligible for qualification through that method. Chirino, however, was far removed from that lofty position, as he was a second officer, with at least six additional years of experience necessary before becoming eligible for promotion to captain. Under these circumstances, the Board concluded, Chirino could "reasonably be held to have knowingly caused the inspector to make those falsifications." J.A. at 9.

---

**3.** Chirino testified that he had flown approximately 50 hours in the pilot position in a Boeing 727 or simulator. However, approximately 40 of those hours were accumulated over six years earlier as part of his second officer's training with Eastern. Chirino testified that, following this six-year hiatus, he spent a mere 10 hours in preparation for his flight check with Inspector Baro. R. 375–76, 382–83, 387–88. None of this latter time was recorded at Eastern.

In the wake of the Board's order, Chirino filed a petition for reconsideration or rehearing. Chirino attached to his petition an affidavit of Inspector Baro, who was now willing to take the stand on Chirino's behalf. The apparent reason for this procedural *volte face* was that Baro had since pled guilty to charges arising out of the incidents recounted here. Inspector Baro's proffered affidavit largely substantiated Chirino's testimony. Accordingly, Chirino argued that, inasmuch as Baro's testimony had previously been unavailable and was of obvious significance to the case, the Board should deem this a "new matter" justifying reconsideration or rehearing pursuant to the Board's rules.[4]

The NTSB denied Chirino's petition. NTSB Order No. EA–2567 (Jul. 27, 1987). But this time, the Board was not of one mind. Two members, Messrs. Goldman and Kolstad, concluded that the proposed testimony of Inspector Baro did not constitute "new matter" within the meaning of the Board's rules. The stated reasoning of these members was as follows:

> That rule was intended exclusively to allow for consideration of evidence of which the proponent was literally unaware before the case was submitted to the Board. Since [Chirino] testified in detail at the hearing on the circumstances surrounding [Inspector Baro's] issuance of a type rating to him. [Inspector Baro's] affirmation of [Chirino's] account of what took place between them does not qualify as "new matter" that was "discovered" after the hearing. The regulation does not provide for reconsideration or rehearing based on any other ground.

J.A. at 13.

Two Board members were of the contrary view. These members considered the prospective testimony of ex-Inspector Baro

a "new matter" and would have remanded the case to the ALJ "for the limited purpose of taking his testimony and making a credibility assessment with respect to it." J.A. at 15.

Chairman Burnett cast what both sides characterize as the tie-breaking vote. Although the Chairman believed Inspector Baro's testimony was "new" in the sense that it had not previously been available, he did not believe that this circumstance required the Board to grant the petition. Rather, Chairman Burnett concluded that the NTSB "must evaluate the matter to determine if it at least meets a threshold which would warrant further consideration." J.A. at 14. The Chairman concluded that Inspector Baro's testimony did not rise to that threshold level.

> Mr. Baro's involvement with [Chirino] in the incident at issue, which led to the loss of his FAA employment, the revocation of his airman certificate, and a criminal conviction, effectively discredits him as a witness. I do not believe the Board is obligated to exercise our discretion to reopen a matter to take testimony that under any objective standard should be entitled to little weight.

J.A. at 14.

## II

Chirino claims that the NTSB erred in two respects. First, he contends that the Board's reversal of the ALJ's credibility finding was arbitrary and capricious. Second, he chastizes the Board for denying his petition for rehearing or reconsideration in the face of the prospective, highly probative testimony of the previously silent Inspector Baro.

## A

■ As the FAA itself articulates the applicable criteria, the "Board's policy is

---

**4.** 49 C.F.R. § 821.57(d) provides:

(d) *Petitions for reconsideration, rehearing, reargument, or modification of order.* The only petitions for reconsideration, rehearing, reargument, or modification of an order which the Board will entertain are petitions based on the ground that new matter has been discovered. Such petitions must set forth the following:

(1) The new matter;

(2) Affidavits of prospective witnesses, authenticated documents, or both, or an explanation of why such substantiation is unavailable; and

(3) A statement that such new matter could not have been discovered by the exercise of due diligence prior to the date the case was submitted to the Board.

not to disturb a credibility finding 'unless there is a compelling reason or the finding was clearly erroneous.'" FAA Brief at 33 (quoting *Administrator v. Timmons,* 2 N.T.S.B. 1206, 1211 (1975) (dissenting statement)); *see also Administrator v. McCraw,* 3 N.T.S.B. 2345, 2347 (1980) ("the 'Board is most reluctant to disturb a credibility finding by a [law judge] unless the record reflects a compelling reason for such action'" (quoting *Administrator v. Coleman,* 1 N.T.S.B. 229, 230–31 (1968)); *Administrator v. Bargen,* NTSB Order No. EA–2248, at 9 (Dec. 23, 1985) (ALJ "credibility determinations are not to be disturbed absent clear error"), *aff'd mem.,* 807 F.2d 177 (9th Cir.1986).[5] In our view, the Board's determination that Chirino's testimony was "inherently incredible" supplied the requisite basis under the NTSB's applicable rules to overturn the contrary findings of the ALJ; in addition, the NTSB's decision in this respect is adequately buttressed by the record.[6]

In essence, the Board refused to credit Chirino's claim that he was an innocent dupe in Inspector Baro's nefarious scheme. As the Board noted in its unflattering assessment of the pilot's testimony, Chirino could offer no plausible explanation for the oddity of Inspector Baro's having Chirino inscribe the word "loan" on the check. The ALJ himself, the NTSB observed, had described Chirino's purported explanation (that this was in payment for the simulator rental) as "far-fetched." J.A. at 9 n. 13.

The fact that industry custom apparently calls for the pilot, not the inspector, to arrange for aircraft or simulators further undermined Chirino's explanation.

Even more important, however, was the implausibility of a veteran pilot's believing that he could be certified on a Boeing 727 without ever having been tested on the aircraft (and, to make bad matters worse, after only a few hours behind the wheel of a simulator in preparation). *See supra* note 3. Pointing to Chirino's considerable piloting experience (and relying on its own expertise in these matters), the Board concluded that a veteran of the cockpit such as Chirino could reasonably be held to know that he could not obtain 727 certification without passing the appropriate tests. As recounted previously, one former FAA official testified that, by virtue of Chirino's inexperience with the aircraft, the probability that the pilot would be able to pass a simulator flight check for a Boeing 727 was zero. For Chirino to assume otherwise, the Board could reasonably conclude, was implausible to the point of incredulity.

For the foregoing reasons, we are unable to condemn the Board's reversal of the ALJ's credibility findings as arbitrary or capricious.[7]

**B**

The remaining issue has to do with the denial of Chirino's petition for reconsideration or rehearing. By virtue of the pecu-

---

**5.** As noted in the text, the NTSB has chosen to erect a high threshold before it will overturn ALJ credibility determinations; as a result, we need not enter the debate over the precise contours of the Supreme Court's teaching in *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951) that in assessing whether an agency's decision was supported by substantial evidence, reviewing courts must take into account the whole record, including "whatever in the record fairly detracts from its weight." *Id.* at 488, 71 S.Ct. at 464. *See Penasquitos Village, Inc. v. NLRB,* 565 F.2d 1074 (9th Cir.1977).

**6.** On prior occasions, the NTSB has overturned ALJ credibility determinations found to be "inherently incredible" or "inconsistent with the overwhelming weight of the evidence." *See, e.g., Administrator v. Klayer,* 1 N.T.S.B. 982

(1970); *Administrator v. Powell,* NTSB Order No. EA–1919 (Jul. 15, 1983).

**7.** We are less edified by the second (and, fortunately for the Board, independent) reason advanced by NTSB for reversing the ALJ's credibility finding—that the ALJ misunderstood Goldstein's testimony. To complicate an already convoluted point, it would appear that the Board misunderstood the manner in which the ALJ understood Goldstein's testimony. The significance of Goldstein's testimony, as viewed by the ALJ, was not whether Chirino actually took a certifying "check ride," but rather whether Chirino *believed* that he did. Goldstein's testimony, if credible, would tend to corroborate Chirino's testimony that he did take a check ride (or at least believed that he took one) and was thus an innocent victim of Inspector Baro's money-making plot.

liar 2–1–2 split in the Board's voting, we are obliged to scrutinize both the explanation of Chairman Burnett and that of Members Goldman and Kolstad for denying the petition. We are satisfied that neither reason, standing alone as the basis of the Board's decision, constituted an abuse of discretion or was contrary to law.[8]

### 1

The parties, understandably, have focused primarily on Chairman Burnett's concurring statement as the critical, tie-breaking vote. Petitioner argues that the Chairman erred in dismissing Inspector Baro's credibility without the benefit of the latter's testimony. As Chirino aptly puts it, "the time to test a witness' credibility arrives *after* he takes the stand, not before." Brief for Petitioner at 10. Chirino views Chairman Burnett's statement as erroneously giving dispositive weight to the undisputed fact of Inspector Baro's criminal conviction.

But we read the Chairman's statement differently. Despite the apparent oddity of refusing to credit testimony before even hearing it, Chairman Burnett's position is, under the circumstances of this case, not without foundation. The posture of the case before the Board, it must be remembered, was a petition for reconsideration or rehearing in which the Board had already rendered an adjudication on the merits, including an assessment of the plausibility of Chirino's version of the operative events (a version that Inspector Baro's testimony would presumably substantiate).

In reviewing petitions for reconsideration or rehearing, the Board has looked in the past to cases construing Rule 59 of the Federal Rules of Civil Procedure (governing new trials) for guidance in determining whether discovery of a "new matter" warrants reconsideration or rehearing within

the meaning of the Board's rules. Informed by those federal court decisions, the NTSB cases have articulated a daunting requirement: in addition to the literal criteria of section 821.57(d) (set out at note 4 *supra* ), for a new matter to warrant the Board's reconsideration or rehearing, a petitioner must proffer noncumulative evidence that would probably change the result in the case. *See Administrator v. Moore,* 3 N.T.S.B. 55, 56 (1977) ("newly discovered evidence … *must be such as would probably produce a different result* ") (emphasis added); *Administrator v. Strock,* NTSB Order No. EA–1794, at 5 (Jun. 8, 1982) ("rehearing request must generally be accompanied by the evidence … that the requesting party believes would require a different conclusion on the ultimate issues in the proceeding"), *reconsideration denied,* NTSB Order No. EA–1834 (Oct. 6, 1982).

In this case, the burden of Chairman Burnett's statement was to assay whether the case should be reopened, not to evaluate the credibility of ex-Inspector Baro's proposed testimony. Having previously (and unanimously) dismissed Chirino's story as "inherently incredible," the NTSB reasonably could conclude that Inspector Baro's testimony would only be cumulative and thus not change the Board's ultimate determination. Indeed, the Board had already considered Inspector Baro's testimony in a companion case, *Administrator v. Martinez,* NTSB Order No. EA–2658 (Feb. 10, 1988). Like Chirino's proceeding, *Martinez* involved the revocation of the airman certificates of another Eastern Airlines pilot charged with fraudulently securing a 727 type rating from Inspector Baro. Again, Pilot Martinez, like Chirino, defended on the basis that he had been the inno-

---

8. The competing positions of the three members comprising the majority were, again, (1) that the testimony was not "new matter" under the Board's rules, and (2) that the testimony, although new, did not have enough chance of altering the outcome to justify the burden of reopening the proceeding. It can thus reasonably be inferred, from the statements by the various Board members, that there were 3–2 majorities *against* each of these propositions. *Cf. National Mutual Ins. Co. v. Tidewater Trans-*

*fer Co.,* 337 U.S. 582, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949) (majority of justices against each of two propositions, either one of which supports the case's outcome). Assuming (as we indeed conclude below) that the Board could properly make each of these findings, we cannot reverse merely because of the presence of adverse majorities. Reversal on that ground would, in our view, unduly intrude on the authority of each Board member to make the judgments found permissible under law.

cent victim of the Inspector's scheme. Unlike the present case, however, the ALJ and the Board in *Martinez* did have the benefit of the Inspector's testimony, which substantially supported the pilot's position. The same ALJ who presided over the *Chirino* proceeding found once again in *Martinez* that the Administrator had failed to carry his burden of proof. Once again, the Board reversed. And, relevantly for our purposes, it did so even with the benefit of Inspector Baro's testimony; indeed, the Board concluded that Pilot Martinez's "reliance defense [is] singularly unconvincing and inherently incredible." *Id.* at 7.

■ In light of the *Martinez* proceeding, it bears recalling that under the Federal Aviation Act it is the Board which serves as the ultimate finder of fact, even with respect to credibility determinations. And, in carrying out its role, the Board enjoys wide discretion in determining whether new evidence warrants the reopening of agency proceedings. In our view, the Board could reasonably conclude that it made little (if any) sense to send the case back to the ALJ when it had already found Chirino's version of events "inherently incredible."

It is in this sense, we believe, that Chairman Burnett deemed Inspector Baro's testimony as "entitled to little weight." J.A. at 14. We understand the Chairman's concurrence to say, in effect, that Inspector Baro's testimony would only be cumulative and thus not warrant reconsideration or rehearing under applicable regulations.[9]

2

Although the parties have not favored us with specific argument on the point, we are also satisfied that the interpretation of sec-

tion 821.57(d) embraced by the two other members who, along with Chairman Burnett, constituted the majority in denying Chirino's petition, represents a reasonable interpretation of the Board's own regulation. Members Goldman and Kolstad, the reader may recall, concluded that Inspector Baro's prospective testimony did not qualify as "newly discovered" evidence within the meaning of the Board's rule.

To assess the reasonableness of this interpretation, we pause to observe that, in an admittedly different but analogous context, cases construing Rule 33 of the Federal Rules of Criminal Procedure governing new trials are instructive on the question of what constitutes "newly discovered" evidence. In the Rule 33 setting, several courts have concluded that post-trial testimony of a co-defendant who initially asserted his or her Fifth Amendment privilege does not constitute "newly discovered" evidence within the meaning of the Rule. *See, e.g., United States v. Metz,* 652 F.2d 478 (5th Cir.1981) (drawing a distinction between "newly discovered" and "newly available" evidence); *United States v. Diggs,* 649 F.2d 731, 740 (9th Cir.), *cert. denied,* 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 387 (1981) ("[w]hen a defendant who has chosen not to testify subsequently comes forward to offer testimony exculpating a co-defendant, the evidence is not 'newly discovered' "); *United States v. Jacobs,* 475 F.2d 270, 286 n. 33 (2d Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed. 2d 53 (1973).

■ These decisions from the criminal law setting provide a direct analogy to the situation before the Board in this case.[10]

---

**9.** *Cf. United States v. Vergara,* 714 F.2d 21 (5th Cir.1983) (upholding district court's determination, in a criminal law context, that a previously silent accomplice's post-conviction willingness to exculpate his co-conspirator did *not* warrant a new trial on grounds that the belated exculpation was not credible or would not be sufficient to produce a different result at a new trial); *United States v. Carlin,* 573 F.Supp. 44 (N.D.Ga. 1983), *aff'd mem.,* 734 F.2d 1480 (11th Cir.1984) (finding once-unavailable testimony of a witness who had asserted Fifth Amendment privilege both cumulative and unlikely to produce an

acquittal (even if it constituted "newly discovered" evidence)).

**10.** We by no means suggest that the Board looked to Rule 33 for guidance in this area. Indeed, Members Goldman and Kolstad made no reference at all to Rule 33, but relied instead on a textual interpretation of the Board's rule. Our discussion of Rule 33 is intended only to show, by the congruity of the results and analysis, that the Board's interpretation of its own rule was a reasonable one. We thus do not uphold the Board's position on a basis not advanced by the agency in violation of well-estab-

In effect, the FAA alleged that Chirino and Inspector Baro were co-conspirators in an unlawful scheme to issue fraudulent ratings. Inasmuch as Inspector Baro chose to remain silent in the earlier proceedings, the Board could reasonably conclude that he should not now be allowed to come forward to exculpate his co-conspirator at a point when to do so was apparently "cost-free" (or at least no longer unacceptably costly) to him.

We do not read Messrs. Goldman's and Kolstad's statement to mean that, under its present rules, the Board could *never* reopen proceedings to consider testimony from a witness who had previously asserted a privilege, even if the proffered testimony were noncumulative or could change the result. We interpret their statement, rather, only to say that, under the particular circumstances of this case, Inspector Baro's proposed testimony fails to qualify as "newly discovered" evidence and does not justify the Board's exercising its discretion to reopen proceedings. That determination, we are persuaded, did not constitute an abuse of the Board's discretion.

*Denied.*

---

lished *Chenery* principles, but more modestly look to this analogous body of law for guidance in assessing the reasonableness of the Board's interpretation.