904 F.2d 78
 284 U.S.App.D.C. 258
 Unpublished Disposition
NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
UNITED STATES of America
v.
Michael BLACKWOOD, et al., Appellants.
 Nos. 88-3113 to 88-3115, and 88-3117 to 88-3119 88-3210.
 United States Court of Appeals, District of Columbia Circuit.
 June 11, 1990.
Rehearing and Rehearing En Banc Denied Oct. 17, 1990.
 
 Before WALD, Chief Judge, and MIKVA and D.H. GINSBURG, Circuit Judges.
 JUDGMENT
 PER CURIAM.
 
 
 1
 This case was considered on the record on appeal from the United States District Court for the District of Columbia and on the briefs filed by the parties. The issues have been accorded full consideration by the court and occasion no need for a published opinion. See D.C.Cir.Rule 14(c). For the reasons stated in the accompanying memorandum, it is
 
 
 2
 ORDERED and ADJUDGED that appellant's convictions be affirmed.
 
 
 3
 The Clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. See D.C.Cir. Rule 15.
 
 MEMORANDUM
 
 4
 Appellants, six of eight men arrested on the scene of a drug raid at a rooming house, appeal their convictions for possession with intent to distribute cocaine, marijuana, and more than 50 grams of cocaine base, and for use of a firearm in relation to drug trafficking. Each of the appellants--Michael Blackwood, Ian Williams, Ron Peter Crossfield, Ron Barrington Crossfield, Claudius Minott, and Stephen Ashley--was convicted on all four counts. Appellants raise numerous arguments for reversal, none of which have merit. This court previously granted appellant Ashley's request that we reverse the district court's decision to deny his ineffective assistance of counsel claim without an evidentiary hearing. After briefing and argument in this case, we issued an interim order on May 10, 1990 granting Ashley's request for an evidentiary hearing pursuant to 28 U.S.C. 2255; we set out below our reasons for so ruling.
 
 
 5
 The district court held a hearing on May 17, 1990 and denied appellant Ashley's section 2255 motion on May 29, 1990. We now affirm that court's reasoning and affirm appellant Ashley's conviction as well as the convictions of all other appellants in this case.
 
 A. Ashley's Ineffective Assistance Claim
 
 6
 Appellant Ashley entered a pro se Petition for Writ of Error, followed by a motion, offered with assistance of counsel, to vacate his conviction and sentence, pursuant to 28 U.S.C. Sec. 2255. Ashley argued that his trial counsel provided ineffective assistance by, inter alia, failing to contact or subpoena witnesses whose testimony might have proven his innocence. In a supporting affidavit, Ashley alleged that he had informed his lawyer of two witnesses, Linda Pratt and his brother, Ian Ashley, who would have provided exculpatory testimony on his behalf. The district court summarily denied Ashley's motion without stating any findings of fact or conclusions of law.
 
 
 7
 Section 2255 requires a hearing before denial of a motion made pursuant to that provision "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." After such a hearing, the court must "determine the issues and make findings of fact and conclusions of law" with respect to the motion. 28 U.S.C. Sec. 2255. Strickland v. Washington, 466 U.S. 668 (1984), sets out a two-part test for demonstrating ineffective assistance of counsel. To succeed in his claim, Ashley must show (1) that his attorney's performance was objectively unreasonable and (2) that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. Because the record was silent on what the potential witnesses might have offered in the way of exculpatory testimony, we could not determine "conclusively" that Ashley's ineffective assistance claim was without merit. For this reason we issued the interim order requiring the district court to conduct an evidentiary hearing on this matter.
 
 
 8
 On remand, after the hearing, the district court found that appellant Ashley's court-appointed counsel, William Seals, contacted the proposed defense witnesses and that Seals exercised objectively professional judgment in declining to call the witnesses. According to the district court's findings, if called at trial Ian Ashley apparently would have testified that his brother was not living at the rooming house but was there at the time of the raid only to pick up his cousin's clothes. If called, Linda Pratt apparently would have testified that she was a friend of Ian and had met appellant Ashley at the rooming house on two or three occasions. We agree with the district court that Seals' proffered reasons for not calling these witnesses were objectively reasonable.
 
 
 9
 Alternatively, we affirm the district court's conclusion that Seals' failure to call the witnesses did not result in any prejudice to appellant Ashley. Appellant Ashley admitted during the remand hearing that the landlords testified at trial that he had been a tenant for nine months and that he told officer Nancy Brown that he lived in the rooming house. With the testimony of the landlords and Officer Brown, there is no "reasonable probability" that the testimony of Ian Ashley and Linda Pratt would have produced a different result at trial.
 
 
 10
 As to Ashley's other allegations of attorney error--failure to cross-examine witnesses at trial, to file motions to sever Ashley's case, to suppress illegally seized evidence, to preserve issues for appeal, or to present any defense at trial--we conclude that even if these alleged errors constituted deficient performance, the record clearly establishes that Ashley was not prejudiced by such errors. Again, we agree with the district court that there is no "reasonable probability" that the trial would have come out differently for Ashley but for the alleged errors, even if those alleged errors are framed as Ashley would have them framed. Ashley and his codefendants were all convicted of the same offenses, and the evidence was strongest against Ashley. He was a nine-month resident of the rooming house and was found hiding under a bed in a room with a large quantity of recently cooked crack in plain view and two loaded guns in and under the dresser.
 
 B. Validity of the Search Warrant
 
 11
 Appellants charge that the search warrant in this case was not valid because the house where the arrests took place was a rooming house, and the warrant failed to specify the particular rooms in the house to be searched. Alternatively they argue that the search exceeded the scope of the warrant. "[T]he validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had the duty to discover and disclose, to the issuing magistrate." Maryland v. Garrison, 480 U.S. 79, 85 (1987). Appellants offer no evidence whatsoever to suggest that the police should have known at the time the warrant was requested that the house was a rooming house rather than a single-family dwelling. Given the lack of indicia that this was a rooming house, we find no authority to suggest the police officers had a duty to inquire further into the nature of the house. Although there is conflicting evidence as to whether the doors to the several bedrooms were open or locked when the officers entered, nothing in the record suggests that the officers should have concluded that each bedroom constituted a separate boarding unit. Therefore, we decline to suppress any evidence resulting from the search. See id. at 86-87.
 
 C. Lawfulness of the Police Entry
 
 12
 Appellants claim that the search was illegal because the police failed to comply with the "knock and announce" statute, D.C.Code Sec. 33-565(g), which requires officers to give notice of authority and purpose before breaking open an entry to execute a warrant. We agree with the district court that the "exigent circumstances" exception applies to this case. See United States v. Bonner, 874 F.2d 822, 826 (D.C.Cir.1989) (applying the exception to the federal version of the "knock and announce" statute, 18 U.S.C. Sec. 3108). The officers heard running in the house even before they reached the front door. Sergeant Exum's shout of "police" at the front door apparently was loud enough to produce a considerable scramble inside the house. At the same time, Officer Brown observed appellant Peter Crossfield dive through a closed window at the back of the house, and radioed to Exum that people were coming out the back. Contrary to appellants' urging, the record as a whole clearly establishes that the police did not enter the rear of the house prior to--or even simultaneous with--the breaking down of the front door. The considerable commotion which Exum heard inside the house was not the sound of other policeman, and it constituted exigent circumstances which relieved him from the requirement of announcing his purpose. See, e.g., United States v. James, 764 F.2d 885, 888-89 (D.C.Cir.1985).
 
 
 13
 D. Booking Question Exception to the Miranda Rule
 
 
 14
 The appellants argue that their answers to Officer Brown's routine booking questions, given prior to receiving Miranda warnings, should be suppressed for violation of the prophylactic principles of Miranda v. Arizona, 384 U.S. 436 (1966). We recognize that several of our sister circuits have adopted a "routine booking" exception to the Miranda rule. This court has hinted, without deciding, that routine booking questions should be exempt from Miranda requirements. See United States v. Hinckley, 672 F.2d 115, 122-23 (D.C.Cir.1982). Without deciding the full range of circumstances which would constitute a "routine" booking, we believe that such an exception should apply in this case. Officer Nancy Brown asked the appellants their names, addresses, dates of birth, social security numbers, height, and weight. The questions were asked shortly after the appellants were handcuffed. The process clearly was " 'a predominately clerical procedure,' " intended primarily for " 'record keeping.' " Id. (citation omitted). Indeed, appellants do not contend otherwise. Instead they suggested at oral argument that in the unique context of a "crack house" arrest, otherwise routine questions concerning an arrestee's place of residence should not be excepted from Miranda because they are likely to elicit incriminating information. But the routine booking exception contemplates that incriminating information might sometimes surface in response to "[r]outine questions ... ordinarily innocent of any investigative purpose." United States v. Carmona, 873 F.2d 569, 573 (2d Cir.1989) (emphasis added). We conclude that Officer Brown's questions were of a type ordinarily innocent of any investigative purpose and therefore find that the appellants' statements need not be suppressed.
 
 
 15
 E. Admissibility of Appellant Minott's Exhibit No. 8
 
 
 16
 Appellants assert that the district court erred in admitting a report prepared by a police officer which merely catalogues documents the officers found in the rooming house as a result of the search. The report was prepared by one Sergeant Hickey, who was not involved in the investigation of appellants' case but is charged with the responsibility of investigating the financial activities of persons in the drug trade in an attempt to invoke civil forfeiture of drug assets. Appellants claim that this report does not fall within the "business record" exception to the hearsay rule, Federal Rule of Evidence 803(8), because it was introduced into the record by the prosecution (rather than the defense). Appellants do not even address the fact that the report was first called to the attention of the trial court by counsel for Minott, who called Sergeant Hickey to the stand apparently in an attempt to show that Minott's learner's permit had not actually been among the documents found on the scene (Tr. VII 47-59). After counsel for Minott examined Sergeant Hickey rather extensively as to the contents of the report, the court granted the prosecution's request that the report be admitted into the record.
 
 
 17
 We agree with the government that this court's ruling in United States v. Smith, 521 F.2d 957 (D.C.Cir.1975), is not applicable to this case. As we have said before, "[w]hile Smith held that police reports were generally inadmissible when offered by the prosecution, the Smith rule has distinct parameters." United States v. Coleman, 631 F.2d 908, 910 (D.C.Cir.1980). The Smith court was concerned that documents containing a summary of the government's case against a criminal defendant would be admitted into evidence. Smith was also predicated on the Supreme Court's decision in Palmer v. Hoffman, 318 U.S. 109 (1943), which addressed the concern that a report prepared by the police with an eye toward litigation, when offered by the party who made the report, may encourage misrepresentation. In this case, the report was not prepared by the officers responsible for the criminal investigation, was brought to light by the defense, and was relied upon by the defense. The report in no way purports to be a summary of the prosecution's case; it merely describes documents that were independently introduced into the record. Under these circumstances, we conclude that the district court did not err in allowing the report to become a part of the formal record. Alternatively, we find that any error occasioned by admitting the report was harmless, as there was extensive independent evidence of the items and opinions represented in the report.
 
 F. Sufficiency of Evidence to Convict
 
 18
 In reviewing the sufficiency of the evidence to convict, we accord substantial deference to the trier of fact. We may reverse a conviction only if we conclude that no reasonable jury, viewing the evidence in the light most favorable to the government and allowing the government all reasonable inferences, could find guilt beyond a reasonable doubt. See, e.g., United States v. Musser, 873 F.2d 1513, 1519 (D.C.Cir.), cert. denied, 110 S.Ct. 518 (1989). We reject the contention that the evidence was insufficient to demonstrate each appellant's guilt of constructive possession of three types of narcotics and of using weapons for drug trafficking.
 
 
 19
 As to constructive possession, we find sufficient evidence that each appellant either exercised direct dominion and control over each type of narcotic or exercised such control jointly with others by participating in the enterprise. Mere presence, proximity to a drug, or association with drug dealers "may establish a prima facie case of drug possession when colored by evidence linking the accused to an ongoing criminal operation of which possession is a part." United States v. Dunn, 846 F.2d 761, 763-64 (D.C.Cir.1988). Such evidence may be circumstantial. The fact that drugs, powerful weapons, and drug distribution paraphernalia were strewn all about the house--in virtually every room and common area and usually in plain view--supports the reasonable inference that the house was the situs of an integrated drug distribution operation. Indeed, the accounts ledger for the operation was found in plain view in the first floor living room. The expert testimony as to the role of "safe houses" in the illegal drug industry bolsters the inference of an integrated drug operation.
 
 
 20
 The jury could easily have believed that those living at the house participated in the operation. Therefore, jurors clearly could have concluded that appellant Ashley, who was identified by the landlords as an occupant of the house, had constructive possession of the drugs as well as the guns. Similarly, the participation of appellants Minott and Peter Crossfield in the operation could be inferred from their having tried to rent a room shortly before the raid took place and their conduct during the raid (Tr. V 28, 96-100, 107-14). Peter Crossfield's desperate attempt to escape through a closed window provides circumstantial evidence of his participation, as does appellant Minott's attempt to seal himself in a bedroom. Additionally, Minott told Officer Brown that he had been living in the house for five months and, officers testified to finding Minott's learner's permit in a dresser (Tr. IV 129, 134).
 
 
 21
 The evidence linking the remaining appellants to the rooming house admittedly is less substantial. Yet, according to expert testimony which the jury was entitled to credit, safe houses are often used in the drug community to provide a place of limited access for persons in a drug operation. Transients, the expert testified, are likely to be found at safe houses because they often operate as transporters of drugs from source cities (Tr. VII 7-15).
 
 
 22
 The government alleges that Barrington Crossfield rented a room in the house, and although the landlords testified only that they saw him there once previously, Barrington did tell Officer Brown that he had "just" rented a room in the house. In any event, Barrington Crossfield, Williams, and Blackwood each were found in rooms with large quantities of drugs and manufacturing/distribution paraphernalia in plain view. Williams and Barrington Crossfield were found (along with Ashley) in a front bedroom on the second floor while Blackwood was found exiting a front bedroom on the third floor. Just as the team entered the house, an officer observed a hand dropping drugs out of the front second-floor window and another hand dropping a liquid out the front third-floor window. Someone else threw guns out of a window in the back of the house.
 
 
 23
 All of this evidence, coupled with the expert testimony on "safe houses," would have allowed a reasonable jury to conclude that each appellant was a participant in the drug operation and therefore had constructive possession of drugs sufficient to sustain the three possession counts and of at least one firearm found during the raid.
 
 
 24
 As to the weapons charge, we conclude that the guns possessed by each appellant were used in relation to drug trafficking. Because there were several high powered guns strewn about in what was clearly a drug operation, we have no difficulty in finding a relation between the guns and the drug distribution objective. We therefore find that there was sufficient evidence for the jury to have convicted each appellant on the fourth count. See United States v. Anderson, 881 F.2d 1128, 1141 (D.C.Cir.1989).
 
 F. Denial of Severance Motions
 
 25
 The decision to grant a severance is committed to the sound discretion of the trial judge whose judgment will not be reviewed absent a clear abuse of discretion. As a matter of law, persons jointly indicted ordinarily should be tried together and the incremental burden of duplicating a complex trial should be considered in the decision whether to grant or deny severance. See United States v. Bridgeman, 523 F.2d 1099, 1107 (D.C.Cir.), cert. denied, 425 U.S. 961 (1976). Severance should be granted where necessary to insure a fair trial, "[t]he critical determination [on review being] whether a jury could reasonably compartmentalize the evidence introduced against each individual defendant." United States v. Hernandez, 780 F.2d 113, 119 (D.C.Cir.1986).
 
 
 26
 We decline to reverse the trial court's denial of appellants' motions to sever. Appellants allege that the admission of "other crimes" evidence against codefendant Wayne Davis and the lack of opportunity to cross-examine or confront the "other crimes" evidence unfairly prejudiced them and denied them a fair trial. We reject appellants' suggestion that the evidence admitted against Davis--that two guns found in the house were stolen from a pawn shop in Tulsa, Oklahoma the same day Davis flew from New York to Tulsa--could not have been compartmentalized by the jury. First, it is clear from the evidence that Davis did not commit the actual burglary of the pawn shop, and the prosecution used the evidence only in an attempt to demonstrate Davis' possession of the two guns. The prosecution made it clear that the evidence was applicable only to Davis (Tr. VIII 40-41). Therefore it cannot be said either that the evidence was "other crimes" evidence or that it implicated the other appellants in the Tulsa burglary. Under these circumstances, appellants have not met their burden of showing a clear abuse of discretion sufficient to reverse the trial judge's denial of severance.
 
 G. Denial of Motion for a New Trial
 
 27
 All of the appellants except Blackwood contest the denial of their motions for a new trial, relying on Blackwood's post-trial statement that he was responsible for all the drugs, guns, and distribution paraphernalia found in the house and that his codefendants knew nothing about the origin of these things. In order to justify a new trial on the basis of new evidence, appellants must show (1) that the evidence was discovered after the trial; (2) that it could not have been discovered earlier with due diligence; (3) that it is not cumulative or impeaching; (4) that it is material; and (5) that it would likely produce an acquittal. United States v. Sensi, 879 F.2d 888, 901 (D.C.Cir.1989). The entirety of the evidence in this case severely undermines Blackwood's assertion that all of the drugs, guns, records, and distribution paraphernalia were possessed solely by him and that the others had no knowledge of these things. We conclude that his delayed confession is not likely to produce an acquittal for the other appellants at a new trial. We therefore find that the district court did not abuse its discretion in declining to hold a hearing prior to denying the new trial motion. Cf. Chirino v. National Transportation Safety Board, 849 F.2d 1525, 1532 & n. 9 (D.C.Cir.1988).
 
 F. Objections to Jury Instructions
 
 28
 Appellants first allege that the trial judge erred in not giving a detailed "mere presence" instruction, although they acknowledge that the judge gave the standard "red book" instruction: "[M]ere presence in the vicinity of a piece of property or mere knowledge of its physical location does not constitute possession." Because the trial judge properly instructed the jury on the law at issue, and because the judge was under no obligation to adopt the appellants' specific formulation of the instruction, we find no error with the instruction as given. See United States v. Payne, 805 F.2d 1062 (D.C.Cir.1986).
 
 
 29
 Equally unavailing is the appellants' argument challenging the trial judge's instructions as to required jury unanimity. Appellants unsuccessfully requested a special unanimity instruction indicating to the jury that it had to agree unanimously on which of the drugs and guns in the house each defendant possessed. We agree with the government that the appellants did not preserve these issues for appeal. Appellants clearly raised no objection regarding the denial of the special unanimity instruction for possession of drugs. (Tr. VIII 150) As to the possession of weapons, at the time the charge was given, appellants did not object on the basis of the need for unanimity on which weapon was possessed. (Tr. VIII 178) They had raised such an objection earlier but the judge offered a footnote to the instruction requiring agreement as to which gun each defendant possessed. (Tr. VIII 150) The judge apparently felt he had accommodated the concerns of the defense since they did not raise any further objections to the specificity of the instructions. Under these circumstances, we conclude that the appellants have waived their rights to appeal this issue. We further find that the failure to give a special unanimity instruction as to possession of drugs and weapons does not constitute plain error. See United States v. Mangieri, 694 F.2d 1270, 1280-81 (D.C.Cir.1982).
 
 H. Allegation of Judicial Bias
 
 30
 While a trial judge must not take on the role of advocate in questioning witnesses, the judge need not be inert, may ask questions, and may assist the jury in understanding uncertain testimony. United States v. Norris, 873 F.2d 1519, 1526 (D.C.Cir.), cert. denied, 110 S.Ct. 113 (1989). We find without merit the appellants' assertion that on numerous occasions "the trial court interjected itself into the questioning of witnesses ... in a blatant attempt to assist the prosecutor in proving his case against the defendants." Both the appellants and the government offer numerous references to the trial transcript to support their respective positions. Having reviewed all of these references, we are convinced that the judge did not assume the role of advocate for the prosecution or tilt the trial toward the prosecution. We therefore conclude that appellants were not denied a fair trial and decline to remand for new proceedings.