988 F.2d 1280
 300 U.S.App.D.C. 322
 NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
Sharon Shelton MIMS, Petitioner,
v.
NATIONAL TRANSPORTATION SAFETY BOARD AND ADMINISTRATOR OF
THE FEDERAL AVIATION ADMINISTRATION, Respondent.
 No. 91-1270.
 United States Court of Appeals, District of Columbia Circuit.
 March 1, 1993.
Rehearing Denied April 13, 1993.
 
 Petition for Review of an Order of the National Transportation Safety Board; No. EA-3284.
 NTSB
 DENIED.
 Before MIKVA, Chief Judge, and SILBERMAN and KAREN LeCRAFT HENDERSON, Circuit Judges.
 JUDGMENT
 PER CURIAM.
 
 
 1
 This petition was heard on the record from the National Transportation Safety Board and on the briefs filed by the parties and arguments by counsel. The court has determined that the issues presented occasion no need for a published opinion. See D.C.Cir.Rule 14(c). On consideration thereof, it is
 
 
 2
 ORDERED AND ADJUDGED that the petition for review be denied.
 
 
 3
 The clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. See D.C.Cir.Rule 15(b).
 
 MEMORANDUM
 
 4
 Sharon Shelton Mims, owner and president of Big Island Air (BIA), seeks review of an order issued by the National Transportation Safety Board (Board) suspending her commercial pilot certificate for fifteen days. The Board reversed the decision of the Administrative Law Judge (ALJ), holding that Mims operated a flight for compensation or hire in violation of section 135.243 of the Federal Aviation Regulations[1] (Part 135) because she received a substantial gratuity and "economic benefit from the flight in the form of ... good will." Administrator v. Mims, NTSB Order No. EA-3284, at 4 (1991). For the reasons set forth below, we deny Mims's petition for review of the Board's order.
 
 I.
 
 5
 Dean Spanos, a wealthy client of Prudential-Bache, was hosting a group of Prudential-Bache brokers on a business trip in Kona, Hawaii. At some point, he needed transportation from Kona to Honolulu so that he could connect with a commercial flight to the mainland. Spanos asked Natalie DeVito, a Prudential-Bache employee, to arrange a charter flight. DeVito contacted Dwayne Nitta, a local travel agent, to arrange the flight. Nitta approached Leon Watson, Manager of BIA, and asked to charter a jet. Watson informed Nitta that BIA did not have a jet certified for Part 135 service, that is, it could not be used to carry passengers for compensation. After consulting with Mims, Watson informed Nitta that Mims planned to make a training flight from Kona to Honolulu and that Spanos could travel without charge on that flight, thereby not violating the regulations. Watson did mention, however, that the crew could accept gratuities. Nitta and DeVito decided a $600 gratuity would be appropriate and DeVito charged Spanos's account in that amount without Spanos's knowledge.
 
 
 6
 Shortly before the flight, Nitta arrived at BIA's office and gave Mims a sealed envelope containing the money. Mims initially refused to take the envelope, but after Nitta informed her that the money had been charged to Spanos and that he would never know about it, she took the money. Mims testified that she did not trust Nitta and therefore accepted the money with the intention of returning it to Spanos when he arrived for the flight. Mims placed the envelope in her office.
 
 
 7
 Mims was in the jet preparing for the flight when Spanos arrived approximately an hour late. In the rush to depart, Mims apparently forgot about the envelope with the money and did not remember about it until the next day when Watson brought it to her attention. Mims testified that she did not know how to contact Spanos so she asked her lawyer to find him. Watson had earlier filled out a charter information form, however, including Spanos's name and containing the notation, "Owner--San. Chargers." This notation indicated, as Watson testified, that Spanos was the owner of the San Diego Chargers of the National Football League (NFL).[2] Watson also testified that he believed Mims knew Spanos's occupation, a belief later confirmed by Mims's testimony. According to Mims, her lawyer advised her to hold the money while he located Spanos. Three weeks after the flight, Mims learned that the Federal Aviation Administration was investigating the incident.
 
 
 8
 After hearing the testimony of the various witnesses, the ALJ concluded that Mims did not violate Part 135. He noted that the evidence was in conflict and based his holding on credibility assessments of the witnesses. He concluded that Mims did not consider the flight a business promotion and that her conduct did not "reflect the indicia of commercial operation for compensation or hire." ALJ Opinion at 4.
 
 
 9
 The Board reversed, finding Mims's explanation for taking the money and not returning it "unconvincing." Administrator v. Mims, NTSB Order No. EA-3284, at 4 (1991). The Board emphasized that Mims had retained the money for three weeks. In addition, the Board concluded "that a reasonable attempt would easily have led to the necessary information [to locate Spanos], especially when we consider the availability of Mr. Nitta." Id.
 
 II.
 
 10
 The Board will reverse an ALJ's credibility determinations only if clear error exists. See Chirino v. National Transp. Safety Bd., 849 F.2d 1525, 1529-30 (D.C.Cir.1988). In the past, the Board has reversed an ALJ's credibility findings "found to be 'inherently incredible' or 'inconsistent with the overwhelming weight of the evidence.' " Id. at 1530 n. 6 (quoting Administrator v. Klayer, 1 N.T.S.B. 982 (1970) and Administrator v. Powell, NTSB Order No. EA-1919 (1983)). Based on the record before us, we conclude that the Board's reversal of the ALJ was not arbitrary and capricious. 5 U.S.C. § 706(2)(A).
 
 
 11
 Although the Board could have provided a better explanation, the evidence supports its conclusion that Mims's testimony was "unconvincing." Mims testified that when Nitta offered her the money she rejected it. She eventually accepted the money only to ensure its return to Spanos. Nevertheless, Mims forgot about it the evening of the flight. After the money was brought to her attention the next day, she contacted her lawyer and asked him to locate Spanos. Yet during the following three weeks, she retained the money and did not once call her lawyer to determine whether he had located Spanos. This inaction seems remarkable for someone anxious to return the money.
 
 
 12
 More important, Mims's testimony that she had no means to locate Spanos is unconvincing. As the Board concluded, Mims could have located him rather easily with a "reasonable attempt." The charter information form for the flight indicated "Owner--San. Chargers." Although the ALJ believed that this notation could be read as "Owner--sans charge," Watson, who wrote the notation, confirmed the former interpretation. Even assuming the notation was unclear, Mims testified that she had been told Spanos owned a football team in southern California--enough information to locate him. Mims or her lawyer, whom she asked to locate Spanos, could have made a telephone call to the three southern California football teams or to the NFL to obtain his business address to send him the money. Mims also could have contacted Nitta to obtain Spanos's business address. This approach would have required almost no effort.
 
 
 13
 The Board's conclusion that Mims's explanation was unconvincing is supported by the record and "supplie[s] the requisite basis to overturn the contrary findings of the ALJ." Chirino, 849 F.2d at 1530. The Board's holding that the acceptance of the gratuity violated Part 135 was a sufficient ground to overturn the ALJ's findings and we accordingly express no opinion on the Board's alternative theory--that BIA benefited in the form of good will--for reversing the ALJ.
 
 
 
 [1]
 Part 135 of the regulations applies in pertinent part to "[t]he carriage in air commerce of persons or property for compensation or hire as a commercial operator ... in aircraft having a maximum seating capacity of less than 20 passengers or a maximum payload of less than 6,000 pounds." 14 C.F.R. § 135.1(a)(3). Section 135.243(a) provides in pertinent part:
 No certificate holder may use a person, nor may any person serve, as pilot in command in passenger-carrying operations of a turbojet airplane [of a particular configuration], or a multiengine airplane being operated by the "Commuter Air Carrier" ..., unless that person holds an airline transport pilot certificate with appropriate category and class ratings....
 
 
 [2]
 Actually, Dean Spanos is Vice Chairman of the San Diego Chargers and son of the owner, Alex Spanos